IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

RYAN HOLNESS
*Defendant*.

Criminal No.:  ELH-09-611

**MEMORANDUM OPINION**

Following a 10-day jury trial in March 2011, defendant Ryan Holness was convicted, *inter alia*, of one count of interstate domestic violence, to wit, murder of his spouse, Serika Dunkley, in violation of 18 U.S.C. § 2261(a)(1) (Count One), and one count of attempted witness intimidation, in violation of 18 U.S.C. § 1512(b)(1) (Count Three).  On June 9, 2011, Judge William Nickerson, to whom the case was then assigned, sentenced Holness to life imprisonment as to Count One, and to a concurrent term of 240 months for Count Three.  ECF 103.[1]

Defendant, who is now self-represented, has filed a motion for compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A).  *See* ECF 160.[2]  It is supported by one exhibit.  ECF 160-1.  And, defendant has submitted a supplemental filing.  *See* ECF 168.  I shall refer to ECF 160 and ECF 168 collectively as the "Motion."  In particular, Holness indicates that his underlying medical conditions render him particularly vulnerable to COVID-19 and warrant his release from prison.  ECF 160 at 8.

---

[1] Due to the retirement of Judge Nickerson, the case was reassigned to me on October 14, 2020.

[2] In correspondence dated October 14, 2020, the Office of the Federal Public Defender indicated that it did not intend to supplement the Motion.  ECF 162.

The government's opposition is docketed at ECF 164 (the "Opposition").  And, Holness has replied.  ECF 166 (the "Reply").

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall deny the Motion, without prejudice.

## I.  Background

Holness was indicted on November 24, 2009.  ECF 1.  The Second Superseding Indictment, filed on March 1, 2011, is the operative charging instrument.  ECF 42.   Holness was charged in Count One with traveling in interstate commerce with the intent to kill and injure his spouse, resulting in death, to wit, murder, in violation of 18 U.S.C. § 2261(a)(1).  *Id.* at 1.  Count Two charged attempted obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). *Id.* at 2.  In Count Three, Holness was charged with attempted intimidation and threatening of a witness, with the intent to influence, delay, or prevent an official proceeding, in violation of 18 U.S.C. § 1512(b)(1).  *Id.* at 3.  And, Count Four charged defendant with the willful and knowing misuse of a United States passport, in violation of 18 U.S.C. § 1544.  *Id.* at 4.  However, Judge Nickerson severed Count Four for trial.  *See* ECF 69; ECF 98 at 1 n.1.

Defendant's jury trial began in March 2011.  ECF 68.  The jury convicted Holness of all charges.  ECF 93; ECF 94.  But, with respect to Count Two, Judge Nickerson subsequently found that "the [jury] instruction at issue was inadequate . . . .", and granted defendant a new trial as to that charge.  ECF 98 at 6.  Thereafter, at sentencing on June 9, 2011 (ECF 101), the government moved to dismiss Count Two and Count Four.  Judge Nickerson granted the motion.  ECF 103 (Judgment) at 1; ECF 119 (Transcript of 6/9/11) at 31.

The Presentence Report (ECF 169, the "PSR")[3] provided information about defendant's background and summarized the evidence presented at trial.  *See id.* ¶¶ 7-27.  In particular, the PSR reflects that defendant was born in December 1980 in Jamaica and immigrated to the United States in 2001.  *Id.* ¶ 7.  At the time of the offense, Holness resided in Maryland and worked as an air traffic controller for the United States Navy.  *Id.* ¶¶ 7, 23.

The Fourth Circuit presented a comprehensive factual summary on direct appeal.  *See* ECF 121 at 3-13; *United States v. Holness*, 706 F.3d 579, 582-87 (4th Cir. 2013).  I incorporate that summary here.  And, I shall refer to the factual summary in the PSR.

The government presented evidence at trial demonstrating that "[e]xactly seven months before [Dunkley's] murder, Holness masqueraded as [Dunkley] on-line using his roommates' laptop computer" and "obtained a $500,000 life insurance policy in the name of his wife and made himself the sole beneficiary."  ECF 169, ¶ 23.  Thereafter, defendant "devised a scheme to bring his wife from New York to Maryland with the intent to kill her."  *Id.*  And, "[o]n June 4, 2009, Holness and his wife traveled together from Brooklyn to Maryland.  Once they arrived in Crumpton, Maryland, Holness and his accomplice killed [Dunkley], stabbing her 58 times, during the early morning hours of June 5, 2009."  *Id.*  According to Judge Nickerson, "Defendant attempted to make the murder appear to be the result of a carjacking . . . ."  ECF 148 at 2.

Further, at some unspecified, later point, "Holness wrote a third-party confession letter while incarcerated by state authorities," from the perspective of the "real killer."  ECF 169, ¶ 27.  Holness then asked his cell mate, Steve McGrath, to "mail the letter to the Washington Post in order to obstruct the official investigation in this case."  *Id.*  However, Holness later learned that

---

[3] The PSR was signed on June 9, 2011.  It was not docketed, however.  The Court located a copy in the Chambers file of Judge Nickerson and submitted it for docketing on January 12, 2022.  *See* ECF 169.

"McGrath cooperated with law enforcement." ECF 169, ¶ 27. In response, he "wrote the words 'rat' and 'snitch' with McGrath's name, home phone number, and home address on the walls of the Kent County Detention Center," with the intention of "intimidat[ing] and influenc[ing] McGrath." *Id.*

In its Opposition, the government asserts that defendant "told the police an elaborate tale to disguise his participation in the murder." ECF 164 at 2. And, he did so after signing a *Miranda* form. *Id.* The government also asserts that DNA and other evidence contradicted defendant's claims. *Id.* at 3.[4]

According to the defense, Holness married Dunkley, a cousin of the defendant through his mother, in June 2003 in Jamaica. ECF 169, ¶ 8. Although "neither party ever denied the marriage," Holness and Dunkley did not live together. *Id.* Rather, it was a marriage of convenience, in which Holness and Dunkley "derived mutual benefits as a result of the marriage." *Id.* For example, Holness "received enhanced military housing allowance benefits by reporting that he was married." *Id.* In return, Dunkley "received military health insurance coverage"; was "named a beneficiary on Mr. Holness' military group life policy"; and she "lived virtually rent free in the home owned by Mr. Holness' mother . . . in Brooklyn, New York." *Id.*

The PSR reflected that defendant's conviction under Count One was subject to a base offense level of 18, in accordance with Section 2A6.2(a) of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"). *Id.* ¶ 33. However, because defendant's conduct resulted in Dunkley's murder, under U.S.S.G. § 2A6.2(c)(1), the murder cross reference applied under U.S.S.G. § 2A1.1. *Id.* And, it called for a base offense level of 43. *Id.* Thus, defendant's adjusted offense level for Count One was 43. *Id.*

---

[4] The government provides no citations to the record for these assertions.

Concerning Count Three, attempted witness intimidation, Holness was subject to a base offense level of 14, pursuant to U.S.S.G. § 2J1.2(a).  ECF 169, ⁋ 39.  However, eight levels were added, in accordance with § 2J1.2(b)(1)(B), because Holness's conduct involved threatening to cause physical injury to a person.  *Id.* ⁋ 40.  Therefore, the adjusted offense level for Count Three was 22.  *Id.* ⁋ 44.

Under the multiple account adjustment (*id.* ⁋⁋ 45-50), defendant's total offense level remained 43.  *Id.* ⁋ 52.  Because Holness had no prior adult criminal convictions, he had a criminal history category of I.  *Id.* ⁋ 55.  The Guidelines called for a sentence of life imprisonment.  *Id.* ⁋ 61.

According to the PSR, Holness advised that his parents separated when he was three years old and he was "primarily raised by his mother."  *Id.* ⁋ 69.  Moreover, defendant reported that he immigrated to the United States in 2001 with his mother and younger brother. *Id.* ⁋ 70.  Holness became a naturalized United States citizen in September 2003.  *Id.*

At the time the PSR was prepared, Holness's brother lived in Brooklyn, New York.  *Id.* ⁋ 69.  In addition, Holness has three sisters who, as of June 2011, resided in Jamaica.  *Id.*  Holness also has two children from two relationships.  *Id.* ⁋⁋ 71, 72.  He spoke of them with great affection at his sentencing.  ECF 119 at 27.

Defendant reported that he "never had any mental or emotional health problems . . . ."  ECF 169, ⁋ 75.  Holness also maintained that his "overall physical health [is] 'good,'" and he "denied receiving any medical treatment or taking any prescription medications."  *Id.* ⁋ 76.  And, he noted that he "consumes alcohol on a social basis; however, he has not experienced any alcohol-related problems."  *Id.* ⁋ 78.  In addition, defendant "denied any use of illegal substances."  *Id.*

Holness advised that he graduated from high school in 1999, prior to his immigration from Jamaica to the United States. ECF 169, ⁋ 79. And, between February 2002 and January 2010, "the defendant was enlisted in the United States Navy," where he was "trained as an air traffic controller." *Id.* ⁋ 80. "Prior to his discharge in January 2010, the defendant had attained the rank of Petty Officer Second Class (E-5)." *Id.*

At the time of sentencing on June 9, 2011 (ECF 101), Holness was thirty years old. *Id.* at 2. Judge Nickerson sentenced defendant to a term of life imprisonment as to Count One and a concurrent sentence of 240 months' incarceration as to Count Three. ECF 103 at 2. Further, defendant was sentenced to a five-year term of supervised release as to Count One, and to a concurrent, three-year term of supervised release with respect to Count Three. *Id.* at 3.

Holness timely appealed to the United States Court of Appeals for the Fourth Circuit. ECF 105. The Fourth Circuit affirmed in an opinion of February 11, 2013. ECF 121; *see United States v. Holness*, 706 F.3d 579 (4th Cir. 2013).

On appeal, defendant contended that Judge Nickerson erred by declining to suppress certain aspects of the government's evidence which, in his view, were obtained in violation of defendant's Sixth Amendment right to the assistance of counsel. ECF 121 at 3. Judge King, writing for a unanimous panel, found that Holness's argument was baseless, but found that "the record indicate[d] a potential abridgement of [defendant's] privilege against self-incrimination and concomitant right to counsel, as secured by the Fifth Amendment." *Id.* Nonetheless, the Fourth Circuit observed that "any Fifth Amendment error was harmless beyond a reasonable doubt." *Id.* Defendant submitted a petition for rehearing and rehearing en banc, which the Fourth Circuit denied by Order of March 11, 2013. ECF 123. The mandate issued on March 19, 2013. ECF 127.

On September 29, 2014, Holness filed a pro se motion to vacate his conviction pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel.  *See* ECF 132.  Judge Nickerson denied the motion by Memorandum (ECF 148) and Order (ECF 149) of March 27, 2017.  Thereafter, Holness noted an appeal to the United States Court of Appeals for the Fourth Circuit.  ECF 150.  However, the Fourth Circuit declined to issue a certificate of appealability and dismissed the appeal.  ECF 152.  Defendant then petitioned the Supreme Court for a writ of certiorari, which was denied by Order of May 14, 2018.  *See* Docket.

Holness is currently serving his sentence at FCI Allenwood Medium.  *See* ECF 160 at 3; *Find an Inmate*, Federal Bureau of Prisons, https://www.bop.gov/inmateloc/ (last visited Jan. 14, 2022).  He submitted a request to the Warden to be released on home confinement on July 6, 2020.  ECF 160-1.  The  request was promptly denied.  *Id.*

## II. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019).  But, "the rule of finality is subject to a few narrow exceptions."  *Freeman v. United States*, 564 U.S. 522, 526 (2011).  One such exception is when the modification is "expressly permitted by statute."  18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.  And, § 3582(c)(i) is one of the exceptions.  *United States v. Jenkins*, ___ F.4th ___, 2021 WL 6130105, at *4 (4th Cir. Dec. 29, 2021).

Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence.  Section 3582 was enacted as part of the Sentencing Reform Act of 1984.  Originally, it permitted a court to alter a sentence only

upon a motion by the Director of the Bureau of Prisons ("BOP"). *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief. *See*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 Fed. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP). In other words, the BOP "had the exclusive authority to petition the court for sentence modifications on compassionate release grounds." *Jenkins*, 2021 WL 6130105, at *5.

For many years, the safety valve of § 3582 languished. The BOP rarely filed motions on an inmate's behalf. As a result, compassionate release was exceedingly rare. *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In December 2018, Congress passed the First Step Act of 2018 ("2018 FSA" or "First Step Act"), Pub. L. 115-391, 132 Stat. 5239 (2018); *see United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). As amended by the 2018 FSA, 18 U.S.C. § 3582(c)(1)(A) now permits a court to reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. (Emphasis added). So, once a defendant has exhausted his administrative remedies, he or she may petition a court directly for compassionate release. *Jenkins*, 2021 WL 6130105, at *5; *McCoy*, 981 F.3d at 276. That option constitutes a sea change in the law.

Under § 3582(c)(1)(A), the court may modify the defendant's sentence if, "after

considering the factors set forth in section 3553(a) to the extent that they are applicable," it finds that

> (i) extraordinary and compelling reasons warrant such a reduction;
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission . . . .

*See United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam).

Accordingly, in order to be entitled to relief under 18 U.S.C. § 3582(c)(1)(A)(i), the defendant must demonstrate that (1) "extraordinary and compelling reasons" warrant a reduction of his sentence; (2) the factors set forth in 18 U.S.C. § 3553(a) countenance a reduction; and (3) the sentence modification is "consistent" with applicable policy statements issued by the Sentencing Commission.  And, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 2021 WL 6130105, at *5.

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276.  But, "[w]hen deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'"  *United States v. Taylor*, 820 Fed. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see also* 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction").

In U.S.S.G. § 1B1.13, the Sentencing Commission addressed the "extraordinary and

compelling reasons" that might merit compassionate release.  It is titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement." *See McCoy,* 981 F.3d at 276-77. The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t), as well as § 994(a)(2)(C). *See McCoy,* 981 F.3d at 276.

In particular, U.S.S.G. § 1B1.13 provides that, on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive, and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons."  U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "**Other Reasons**," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-all' category."  *McCoy*, 981 F.3d at 276.

However, as the *McCoy* Court recognized, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the First Step Act.  *McCoy*, 981 F.3d at 276.  Of significance here, it is only "directed at BOP requests for sentence reductions."  *Id.* (citing U.S.S.G. § 1B1.13).  "By its plain terms, in short, § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)."  *Id.* at 282; *see also Jenkins*, 2021 WL 6130105, at *5; *United States v. Zullo,* 976 F.3d 228, 230 (2nd Cir. 2020); *United States v.*

*Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Therefore, "[a]s of now, there is no Sentencing Commission policy statement 'applicable' to [] defendants' compassionate-release motions, which means that district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283. Conversely, district courts are "'empowered…to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (quoting *Zullo*, 976 F.3d at 230); *see also Jenkins*, 2021 WL 6130105, at *5. But, "rehabilitation alone cannot serve as a basis for compassionate release," although it may be considered. *United States v. Davis*, ___ F. App'x ___, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; 28 U.S.C. § 994(t).

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, NKM-17-00003, 2020 WL 1650406, at *3 (W.D. Va. Apr. 2, 2020). And, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, the court must then consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *see also United States v. Butts*, ___ Fed. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider §

3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 Fed. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021) (court must consider the § 3553(a) factors).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 2021 WL 6130105, at *5. However, of relevance here, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187. Therefore, the district court is "'empowered . . . to consider *any* extraordinary and compelling reason for release'" raised by a defendant. *McCoy*, 981 F.3d at 284 (citation omitted); *see Jenkins*, 2021 WL 6130105, at *5.

To be sure, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020). And, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release." *Jenkins*, 2021 WL 6130105, at *6. But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its

12

exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted).

### III.  COVID-19[5]

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[6]  Defendant filed his first motion for compassionate release in July 2020.  ECF 723.  At that time, as now, the nation was "in the grip of a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020).

The judges of this Court "have written extensively about the pandemic." *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of it. *Id.*

That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it." *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 Fed. App'x 978 (6th Cir. 2020). For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and

---

[5] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[6] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

schools were shuttered or operated on a limited basis.  This is because the virus is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Apr. 2, 2020), https://bit.ly/2XoiDDh.

Many people who are stricken with the virus experience only mild or moderate symptoms. But, the virus can cause severe medical problems as well as death, especially for those in "high-risk categories . . . ." *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).  As of January 14, 2022, COVID-19 has infected more than 64 million Americans and caused approximately 846,000 deaths in this country.  *See COVID-19 Dashboard*, The Johns Hopkins Univ., https://bit.ly/2WD4XU9 (last accessed Jan. 14, 2022).

In prior months, this country saw a reduction of COVID-19 cases.  In the fall the trend became more favorable.  *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. TIMES, Oct. 27, 2021,   https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html   ("The number of new daily COVID-19 cases has plunged since peaking on Sept. 1.  Almost as encouraging as the magnitude of the decline is its breadth: Cases have been declining in every region.").  But, the spread of the Delta variant reversed this trend. *See* Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021 "[i]nfections have spiked to the highest levels in six months").  Indeed, the Delta variant is thought to be more virulent and capable of causing more severe illness than were earlier strains of COVID-19. *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND   PREVENTION,    https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants"); Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*,

WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show.").

More recently, the emergence of the Omicron variant, around the world and in the United States, has sparked further cause for concern. Although much remains unknown about Omicron, including its severity and the relative effectiveness of vaccines against the variant, it is believed to be highly contagious. *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021). Authorities warn that there remain reasons for caution, including relatively low levels of vaccination in some parts of the country, as well as the encroachment of colder weather and the holiday season, which will lead to an increase in the number of indoor gatherings. *See* Kamp & Abbott, *supra*.

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the virus. Those risk factors initially included age (over 65); lung disease; asthma; chronic kidney disease; serious heart disease; obesity; diabetes; liver disease; and a compromised immune system. *See Coronavirus Disease 2019 (COVID-19), People Who Are at Risk for Severe Illness*, CTRS. FOR DISEASE CONTROL & PREVENTION (May 14, 2020), https://bit.ly/2WBcB16.

The CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19. Most recently in December 2021, it again updated its guidance to reflect the most available data. *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (Dec. 14, 2021), https://bit.ly/38S4NfY. According to the

CDC, the factors that increase the risk include cancer; chronic kidney disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and hypertension; HIV; being immunocompromised; liver disease; obesity, where the body mass index ("BMI") is 25 or higher; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions, such as depression and schizophrenia spectrum disorders; substance use disorders; and tuberculosis. *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk. *See Older Adults At Greater Risk of Requiring Hospitalization or Dying if Diagnosed with COVID-19*, CTRS. FOR DISEASE CONTROL & PREVENTION (Nov. 27, 2020), https://bit.ly/3g1USZ1. Furthermore, "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*.

To stem the spread of the virus, people were urged to practice "social distancing" and to wear masks. *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://bit.ly/3dPA8Ba (last accessed December 9, 2020). However, social distancing is particularly difficult in the penal setting. *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area."). Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.

*Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others.  *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread.  *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces

within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. Indeed, as the Third Circuit recognized in *United States v. Raia*, 954 F.3d 594, 597 (3rd Cir. 2020), the BOP has made "extensive and professional efforts to curtail the virus's spread."[7]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP. The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction. *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

---

[7] The *New York Times* reported in June 2020 that cases of COVID-19 "have soared in recent weeks" at jails and prisons across the country. Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020) (On October 29, 2020, the *New York Times* reported that, "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19.). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems." *America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

Former Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, on March 26, 2020, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  Then, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  Notably, the April 3 memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

On May 8, 2020, two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

Although there is currently no cure for the virus, medical treatments have continued to improve.  And, significantly, we have seen the rollout of three vaccines for COVID-19 (Pfizer, Moderna, and Johnson & Johnson).[8]  Initially, the vaccines were made available to health care

---

[8] Questions as to the efficacy of the Johnson & Johnson vaccine have been raised as to the Delta and Omicron variants.  *See J&J, Sinopharm, Sputnik V COVID-19 shots less effective against Omicron- study*, REUTERS (Dec. 17, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/jj-sinopharm-sputnik-v-shots-weaker-against-omicron-study-shows-2021-12-17/; Apoorva Mandavilli, *J&J Vaccine May Be Less Effective Against Delta, Study Suggests*, N.Y.

workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has expanded considerably, and the vaccine is now approved for all persons five years of age and older. *See* Cheyenne Haslett, *FDA Authorizes COVID-19 Vaccine for Kids 5-11*, ABC NEWS, Oct. 29, 2021,                     https://abcnews.go.com/Politics/fda-authorizes-covid-19-vaccine-kids-11/story?id=80846188.  Approximately 72% of all persons twelve years of age and older are fully vaccinated.  *See How Vaccinations Are Going in Your County and State*, N.Y. Times, https://www.nytimes.com/interactive/2020/us/covid-19-vaccine-doses.html (last visited Jan. 14, 2022).  And, 63% of the total U.S. population is fully vaccinated.  *See id.*  Moreover, about 77.1 million Americans have received a third or "booster" vaccine dose, which the CDC now recommends for all persons age 12 and older.  *See id.*; *COVID-19 Vaccine Booster Shots*, CTRS. FOR DISEASE CONTROL, https://www.cdc.gov/media/releases/2022/s0105-Booster-Shot.html (last updated Jan. 5, 2022).

Given the vaccine rollout, the BOP published "COVID-19 Vaccine Guidance" on January 4, 2021 (version 7.0). *COVID-19 Vaccine Guidance*, Federal Bureau of Prisons Clinical Guidance (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf.  Administration of the COVID-19 vaccine (Pfizer and Moderna) will "align with [recommendations of] the Centers for Disease Control and Prevention."  *Id.* at 4.  Its plan was for prisoners at heightened risk to receive priority for the vaccine.  *Id.* at 6.

The BOP reportedly received its first shipment of vaccines on December 16, 2020.  Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, Forbes (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/ federal-bureau-of-

---

TIMES, (July 20, 2021), https://www.nytimes.com/2021/07/20/health/coronavirus-johnson-vaccine-delta.html.

prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f.  As of January 14, 2022, the BOP had 135,501 federal inmates and 36,000 staff.  And, by that date, the BOP had administered 284,099 vaccine doses to staff and inmates.  *See* https://www.bop.gov/coronavirus/ (last accessed Jan. 14, 2022).

As of January 14, 2022, the BOP reported that 6,043 out of a total 135,427 federal inmates and 939 BOP staff out of some 36,000 staff members, currently test positive for COVID-19; 42,678 inmates and 9,027 staff have recovered from the virus; and 277 inmates and seven staff members have died from the virus.  *Id.*  Moreover, the BOP has completed 129,202  COVID-19 tests.  *See id.*

With respect to FCI Allenwood Medium, where the defendant is imprisoned, the BOP reported that as of January 14, 2022, out of a total of 1,153 inmates, 8 have tested positive, zero have died of COVID-19, and 465 inmates and 54 staff have recovered at the facility.  In addition, at the FCC Allenwood complex, which includes FCI Allenwood Low, FCI Allenwood Medium, and Allenwood USP, 575 staff members and 1,963 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/, Federal Bureau of Prisons, https://www.bop.gov/locations/institutions/alm/ (last visited Jan. 14, 2022).    And, according to the Government, "Holness is fully vaccinated . . . ."  ECF 164 at 10.

### IV. Discussion

The Motion is predicated on the assertion that defendant's underlying medical conditions render him particularly vulnerable to COVID-19.  ECF 160 at 8.  To that end, defendant advises that he suffers from high cholesterol and a weakened immune system, and "was born with the sickle cell trait/G6PD."  *Id.*  And, in the Reply, defendant claims that he has sickle cell anemia.

ECF 166 at 6.  Further, he indicates that he has hypertension and is obese.  *Id.*  But, he  does not provide his BMI.  Nor has he or the government provided the Court with any medical records.[9]

And, the Reply includes the argument, for the first time, that the Court should grant the Motion on the ground that if defendant were "convicted today . . . the outcome of his case would clearly [be] different."  *Id.*  He provides a list of defendants involved in murder cases and other serious crimes who "routinely receive far less than life without parole sentences."  *Id.* at 4.

As to the sentencing factors outlined in 18 U.S.C. § 3553(a), Holness contends that he has "exhibited outstanding behavior during his time of incarceration in the BOP . . . ."  ECF 160 at 7. And, he indicates that, upon his release, he will enjoy a strong network of support in the community.  *Id.* at 9.

### A.  Extraordinary and Compelling Circumstances

### 1.  COVID-19

As mentioned, Holness maintains that the Court should grant the Motion because his underlying health conditions render him particularly vulnerable to COVID-19 and thus create an extraordinary and compelling reason for his release.  ECF 160 at 7-9.  In particular, defendant advises that he has high cholesterol, for which he takes a daily medication.  *Id.* at 8.  Further, he indicates that he has a "weakened immune system [that] causes him to be more susceptible to any air or surface borne allergens and viruses such as the [sic] COVID-19."  *Id.*  Holness also reports that "he was born with the sickle cell trait/G6PD," which "affects him on a daily basis" and "puts him at a greater risk of fatality were he to contract the COVID-19 virus."  *Id.*   In the Reply,

---

[9] The Court is mindful that in other cases, the government has provided such records.

Holness also indicates that he is obese and suffers from hypertension.  ECF 166 at 6.  And, he notes that he has sickle cell anemia.  *Id.* [10]

The government disputes Holness's assertions, but does not otherwise offer much substantive argument.  It did not submit defendant's medical records, and states only that defendant "has no qualifying medical conditions" and is "fully vaccinated."  *Id.* at 10 (emphasis omitted).

To be sure, a compromised immune system, obesity, hypertension, and sickle cell disease are among the conditions that, according to the CDC,  "can make you more likely to get severely ill from COVID-19."  *See Certain Medical Conditions*, *supra*.   In addition, the CDC cautions that "[t]he risk of severe COVID-19 increases as the number of underlying medical conditions increases in an individual."  *Id.*

However, as noted, neither Holness nor the government has submitted copies of defendant's medical records.  In the absence of such evidence, it is impossible for the Court to ascertain the nature of defendant's underlying health conditions.  Thus, I cannot determine whether Holness's asserted medical conditions constitute an extraordinary and compelling reason that warrants his release from prison at this time.

## 2.   Challenge to Conviction

In the Reply, defendant argues, for the first time, that his case presents extraordinary and compelling circumstances because his sentence "was a product of misinterpretation of the law and under today's sentencing scheme, the Court would not have authority to give him such a long and harsh sentence."  ECF 166 at 4.  However, Holness does not identify the particular error at issue in his case, contending only that if he were to be sentenced today under 18 U.S.C. § 2261(a)(2),

---

[10] Sickle cell anemia is a type of sickle cell disease and "is usually the most severe form of the disease."  *What is Sickle Cell Disease?*, CNTRS. FOR DISEASE CONTROL, https://www.cdc.gov/ncbddd/sicklecell/facts.html (last accessed Jan. 13, 2022).

"the outcome of his case would clearly [be] different." *Id.* at 6 (citing *Bailey v. United States*, 2:95-cr-00002, 2018 WL 10128184 (S.D.W. Va. Nov. 21, 2018)).[11]  He identifies several defendants whose sentences for allegedly comparable crimes were far less than his.  ECF 166 at 4-6.

However, defendant did not raise this contention in the Motion.  *See* ECF 160.  And, "'the ordinary rule in federal courts is that an argument raised for the first in a reply brief or memorandum will not be considered.'"  *Gaske v. Crabcake Factory Seafood House, LLC*, JMC-18-2630, 2021 WL 3188007, at *6 (D. Md. Jul. 28, 2021) (quoting *Clawson v. FedEx Ground Packaging Sys.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006)); *see United States v. Al–Hamdi*, 356 F.3d 564, 571 n.8 (4th Cir. 2004) (declining to consider an argument first raised in reply brief and noting that it "is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned").

In any event, defendant's contention is unavailing.  As best the Court can discern, Holness appears to argue that his conviction under Count One should be vacated on the ground that he did not commit a crime of violence that can support a conviction for interstate domestic violence under 18 U.S.C. § 2261(a)(1).  ECF 166 at 6.  To be sure, a conviction under 18 U.S.C. § 2261(a)(1) must be predicated on a finding that the defendant committed a crime of violence.  At the time defendant was convicted, the statute read, *id.* (emphasis added):

> A person who travels in interstate or foreign commerce or enters or leaves Indian country or within the special maritime and territorial jurisdiction of the United States with the intent to kill, injure, harass, or intimidate a spouse, intimate partner, or dating partner, and who, in the course of or as a result of such travel, *commits or attempts to commit a crime of violence* against that spouse, intimate partner, or dating partner, shall be punished as provided in subsection (b).

---

[11] As noted, defendant was convicted under 18 U.S.C. § 2261(a)(1), not (a)(2).  *See* ECF 103 at 1.

Generally, a motion for compassionate release is not a vehicle to challenge the legality of a conviction. *See United States v. Dillman*, 5:11-CR-00044, 2021 WL 3083034, at *8 (W.D. Va. Jul. 21, 2021) ("As district courts around the country have acknowledged, sentencing errors are addressed through objections to the PSR, direct appeals, and habeas petitions, not compassionate release motions."); *United States v. Lisi*, 440 F. Supp. 3d 246, 251 (S.D.N.Y. 2020) (explaining it would be improper to allow a defendant "to use 18 U.S.C. § 3582(c)(1)(A) as a vehicle for claiming legal wrongs, instead of following the normal methods of a direct appeal or a habeas petition"); *but see United States v. Decator*, 452 F. Supp. 3d 320, 324-26 (D. Md. 2020) (granting compassionate release to a defendant on the ground that if he had been convicted for the same offense subsequent to the enactment of the First Step Act, he would have received a dramatically shorter sentence).

Holness has submitted a supplemental filing (ECF 168), in which he appears to ask the Court to reserve its judgment on the Motion because the Supreme Court recently granted a writ of certiorari in a case from the United States Court of Appeals for the Fourth Circuit that might be relevant here. *See United States v. Taylor*, 979 F.3d 203 (4th Cir. 2020), *cert. granted*, 141 S. Ct. 2882 (2021). In *Taylor*, 979 F.3d at 210, the Fourth Circuit determined that attempted Hobbs Act robbery was not "categorically a 'crime of violence'" for purposes of a conviction under 18 U.S.C. § 924(c).

Simply put, the Court sees no reason to believe that the Supreme Court's decision will bear on the merits of the Motion. But, as I explain below, I shall deny the Motion, *without prejudice*. This means that defendant may renew his argument at a later date, at which time he or the government can submit defendant's pertinent medical records. And, defendant could raise his

claim of a disparate sentence, and also incorporate the Supreme Court's forthcoming decision, if appropriate.

### B.  Sentencing Factors

Even if the Court were to reach the second prong of the § 3582(c)(1)(A) analysis, the 3553(a) sentencing factors weigh heavily against Holness.    Indeed, where a court finds extraordinary and compelling reasons for compassionate release, relief is available under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a). *See High*, 997 F.3d at 186; *see also United States v. Butts*, ___ F. App'x ___, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).   These include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims.  *High*, 997 F.3d at 186.

Defendant's offense of conviction is bone-chilling.  He planned and participated in the brutal murder of his wife, in cold blood, so that he could collect the proceeds of a life insurance policy.  *See* ECF 169, ¶ 23.  Her young son lost his mother.  *See* ECF 119 at 6, 14.  And, once in custody, Holness attempted to threaten a witness who cooperated with the authorities.  ECF 169, ¶ 27.  Certainly, criminal activity of this magnitude calls for a term of imprisonment far greater than the twelve years of incarceration Holness has served to date.  *See id.* ¶ 61.[12]

---

[12] Holness has been held in federal custody at least since the day of his Initial Appearance, which occurred on December 1, 2009.  *See* ECF 5.

On the other hand, a life sentence without the possibility of parole is substantial punishment. Moreover, it appears longer than at least some federal sentences imposed for murder. For example, in *United States v. Antoine*, PWG-19-140, the defendant was involved in a drug trafficking organization in Baltimore and confessed to the intentional shooting and killing of an individual in relation to the drug conspiracy. *See id.*, ECF 349 at 9-10. He pleaded to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime. *Id.* Although Antoine was the shooter, Judge Grimm imposed a total sentence of 270 months (22.5 years). *Id.*, ECF 465.

To be sure, when one pleads guilty and accepts responsibility, a court may find a basis for some leniency. That is not the situation here.

But, as Judge Blake recently observed, the average federal sentence for murder has declined in recent years. *See United States v. Bryant*, 95-202-CCB-3, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)); United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2018, Fourth Circuit, available at (https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2018/4c18.pdf), *aff'd*, *McCoy*, 981 F.3d 271. Indeed, the trend has continued since the time *Bryant* was decided: data from the United States Sentencing Commission reflects that in fiscal year 2020, the national average sentence for murder was 255 months, and the Fourth Circuit average was 271 months. *See* United States Sentencing Commission, Statistical Information Packet, Fiscal Year 2020, Fourth Circuit,

available     at     https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/state-district-circuit/2020/4c20.pdf.

In addition, Holness avers that he "is highly unlikely to reoffend or pose any threat to the community." ECF 160 at 9.  In particular, he notes that he "has been a mentor to his fellow inmates since he has been committed to the BOP" and has "no record of infractions." *Id.* at 7. Further, he states that he "has never been involved in any violent incidents during his time of incarceration" and, moreover, he "has been actively participating in programs and seeking positive change in prison." *Id.* at 8, 9.  As a result, defendant avers that "he has gained pro social skills and positive energy." *Id.* at 9.  Further, he contends that he is "ready to be a productive member of society." *Id.*

Holness also reports: "He has a very strong connection with his family and friends who are ready willing [sic] to help and assist him getting a job in the food service or the janitorial field." *Id.*  Specifically, defendant indicates that he "plans to live with his mother and sister in Brooklyn, N.Y. if . . . [given] the opportunity." *Id.*  And, Holness points out that he "would be on supervised release for a number of years lowering [sic] any chance of recidivism." *Id.* at 8.

To be sure, rehabilitation alone cannot justify compassionate release. *See Davis*, 2022 WL 127900, at *1; 28 U.S.C. § 994(t).  But, without question, the Court may consider Holness's post-sentencing conduct to determine whether he has been rehabilitated during his term of imprisonment.  See *Pepper v. United States*, 562 U.S. 476, 492 (2011) (recognizing that a defendant's post-sentencing conduct "provides the most-up-to-date picture of [a defendant's] 'history and characteristics'") (quoting 18 U.S.C. § 3553(a)(1)).  And, the Court is heartened to learn that defendant appears to be committed to his rehabilitation.

However, defendant has not offered any records to the Court to corroborate his claims, such as his disciplinary record or his participation in programming. Holness's bald assertions, in and of themselves, are inadequate to persuade the Court that he should be released at this time.

Accordingly, at this time, I am persuaded that Holness's release would be inconsistent with the sentencing factors outlined in 18 U.S.C. § 3553(a).

### IV. Conclusion

In light of the foregoing, I shall deny the Motion, *without prejudice*. An Order follows, consistent with this Memorandum Opinion.


Date: January 14, 2022                              _____/s/_____

                                                                     Ellen L. Hollander
                                                                     United States District Judge

29