**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

UNITED STATES OF AMERICA

v.

RYAN HOLNESS,
*Defendant*.

Criminal No. ELH-09-0611

**MEMORANDUM OPINION**

This Memorandum Opinion addresses numerous motions filed by defendant Ryan Holness, who is serving a life sentence for the murder of his wife in June 2009.

On November 24, 2009, Holness was charged, *inter alia*, with the murder of his spouse, Serika Dunkley Holness.[1] *See* ECF 1. Following a 10-day jury trial in March 2011, Holness was convicted of interstate domestic violence, to wit, the murder of his spouse in June 2009, in violation of 18 U.S.C. § 2261(a)(1) (Count One), and attempted witness intimidation, in violation of 18 U.S.C. § 1512(b)(1) (Count Three). *See* ECF 93.[2] At sentencing on June 9, 2011, defendant was thirty years of age. ECF 169 (Presentence Report or "PSR"), at 2.[3] Judge William Nickerson, to

---

[1] To distinguish Mr. Holness from Ms. Holness, I shall refer to Ms. Holness by her maiden name, "Dunkley."

[2] Defendant was also convicted of obstruction of justice, in violation of 18 U.S.C. § 1512(c)(2) (Count Two). But, Judge William Nickerson, to whom the case was then assigned, granted defendant a new trial as to Count Two. ECF 98. Count Four, charging passport fraud, was severed for trial. At sentencing, the government moved to dismiss Count Two and Count Four. ECF 103; ECF 119 (Tr. of 6/9/11), at 31; ECF 148 at 1 n.1.

[3] Throughout the Memorandum Opinion, the Court cites to the electronic pagination. However, the electronic pagination does not necessarily correspond to the page number imprinted on a particular submission.

whom the case was then assigned, sentenced Holness to life imprisonment as to Count One and to a concurrent term of 240 months of imprisonment for Count Three. ECF 103.[4]

Defendant is a prolific filer of motions and correspondence challenging his convictions and his sentence. Numerous motions are pending, as set forth below.[5]

Defendant filed a "Motion for Update Status Under COVID-19 'Omicron/Delta.'" ECF 172 ("Status Motion"). The Status Motion concerned defendant's then pending compassionate release motion (ECF 160). The Status Motion is dated January 10, 2022; the envelope is postmarked January 14, 2022 (ECF 172-1); and it was docketed on January 19, 2022. Coincidentally, on Friday, January 14, 2022 — the same date as the postmark on the Status Motion — the Court issued a Memorandum Opinion (ECF 170) and Order (ECF 171) denying Holness's motion for compassionate release (ECF 160).[6] Because the Court has resolved defendant's prior compassionate release motion, and because the Status Motion (ECF 172) is directed to Holness's prior compassionate release motion, I shall deny the Status Motion (ECF 172), as moot.

Holness also filed a "Motion to Reinstate Motion for Reduction of Sentence Pursuant to the First Step of Act of 2018" ("2018 FSA"). ECF 174.[7] In this submission, Holness seeks

[4] Due to the retirement of Judge Nickerson, the case was reassigned to me on October 14, 2020. *See* Docket.

[5] The recitation does not include motions that the Court has already resolved. *See* ECF 148, ECF 149, ECF 170, ECF 171. Included in the recitation of pending motions are letters from Holness that, liberally construed, could be regarded as motions.

[6] The Memorandum Opinion (ECF 170) was docketed on January 14, 2022. However, for unknown reasons, the Order was not docketed with the opinion. The Court was closed on Monday, January 17, 2022, in observance of the Martin Luther King holiday. The Order was docketed on Tuesday, January 18, 2022.

[7] Holness asked the Court to hold the motion "in abeyance pending decision in Conception [sic] v. United States, 991 F.3d 279 (1st Cir.), cert. granted 142." ECF 174 at 2. *Concepcion v. United States*, 597 U.S. 481 (2022), has since been decided by the Supreme Court.

compassionate release under "section 404(b) and 603 of the First Step Act of 2018." *Id.* at 2.[8] It is supported by an exhibit. ECF 174-1. The Office of the Federal Public Defender ("FPD") declined to supplement ECF 174 or seek appointment of counsel. *See* ECF 233.

The government filed an opposition to ECF 174, docketed at ECF 188. It is supported by several exhibits. ECF 188-2; ECF 190.[9] Holness replied (ECF 192) and filed several supplements and submissions. *See* ECF 193; ECF 195; ECF 205. Then, the government filed a supplemental opposition. ECF 214. Defendant again replied. ECF 216. Thereafter, Holness filed two supplemental motions: ECF 222 and ECF 232. He also filed additional exhibits. ECF 222-1 to 222-6.

I shall construe defendant's filings at ECF 174, ECF 192, ECF 193, ECF 195, ECF 205, ECF 216, ECF 222, and ECF 232 collectively as a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i). And, I shall refer to them together as the "Motion." I shall refer to ECF 188 and ECF 214 collectively as the "Opposition."

In addition, Holness has filed a "Motion to file 28 U.S.C. 2255 to Reconsider . . . In light of *Castro v. United States*, 540 U.S. 375, 157 L. Ed. 778 (2003)." ECF 167 ("Motion to

---

[8] Section 603 amended the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A)(i). *See United States v. Becks*, GEC-14-0033, 2020 WL 4587523, at *1 (W.D. Va. Aug. 10, 2020). Section 404(b) "made the Fair Sentencing Act [of 2010] sentence reductions retroactive . . . by authorizing district courts to impose a reduced sentence on specified 'covered offenses' as if the Fair Sentencing Act [of 2010] were in effect at the time the offenses were committed." *United States v. Lancaster*, 997 F.3d 171, 173 (4th Cir. 2021). Under the Fair Sentencing Act of 2010, "'covered offense' means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010." 2018 FSA, 132 Stat. at 5222 § 404(a).

Holness was convicted under 18 U.S.C. §§ 2261(a)(1) and 1512(b)(1). Neither offense was modified by the Fair Sentencing Act of 2010. Accordingly, relief under section 404(b) is not available here.

[9] Holness's medical records are filed under seal at ECF 190.

Reconsider"). It concerns a motion filed by defendant in September 2014 (ECF 132), which was construed by Judge Nickerson as a post-conviction petition. Judge Nickerson denied ECF 132 by Memorandum and Order of September 27, 2017. *See* ECF 148, ECF 149. Holness asks this Court to reconsider Judge Nickerson's characterization of ECF 132 as a post-conviction motion, claiming that he did not receive the required "Castro notice before the original 2255 was decided." ECF 167 at 1.

Moreover, defendant has filed a "Motion To Void Judgment Pursuant To Fed. R. Civ. P. 12(h)(3)." ECF 199 (the "Rule 12 Motion"). He claims "lack of subject matter [and] personal jurisdiction . . . ." *Id.* at 3 (capitals omitted). Defendant filed seventeen exhibits in support of his Rule 12 Motion. *See* ECF 199-1 to 199-17.

Further, defendant has filed "Motion For Relief Pursuant [To] Fed. R. Civ. P. 60(b)(2), (b)(3), (b)(4), and (d)(3)." ECF 200 (the "Rule 60 Motion"). As grounds, defendant asserts, *inter alia*, newly discovered evidence and fraud on the court. *Id.* at 2, 4. The Rule 60 Motion is supported by sixteen exhibits. *See* ECF 200-1 to 200-16.

The government filed a combined opposition to the Rule 12 Motion and the Rule 60 Motion. ECF 209. Defendant replied. ECF 210. Thereafter, defendant filed a supplemental motion pursuant to Fed. R. Civ. P. 60(b) and (d) (ECF 213), to which he appended four additional exhibits. ECF 213-1 to 213-4. I shall consider ECF 213 as part of the Rule 60 Motion. And, I shall sometimes refer to the Rule 60 Motion (ECF 200, ECF 213) as a "Motion to Vacate."

Mr. Holness has repeatedly requested documents from the court and from his former attorneys with regard to his criminal case and that of his accomplice, Dellando Campbell, including a sealed document referenced at ECF 65. *See* "Motion for Production and/or Inspection of Court Records" (ECF 155); "Motion for Disclosure of: Grand Jury Transcripts, Ballot, or Record for

Inspection; Indictment; and Criminal Complaint" (ECF 158); letter requesting documents and records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552) (ECF 176).[10]; letter to the Clerk of the Court dated June 21, 2022, requesting documents that are referenced on the Docket (ECF 182); "Motion to for [sic] Evidentiary Hearing and to Compel Discovery" (ECF 196); letter of November 20, 2023, requesting documents (ECF 198); and "Motion to Compel Attorney to Surrender Case File Motion for the Production of Attorney's Case File" (ECF 226), which is supported by an exhibit. *See* ECF 226-1. I shall refer to these filings collectively as the "Discovery Motions."

With respect to ECF 226, defendant's former attorneys, Alan R. L. Bussard and Gerald C. Ruter, oppose defendant's motion to compel the production of his case file. ECF 228.[11] They appended three exhibits to their opposition. ECF 228-2 to ECF 228-4. Holness replied. ECF 231.

Holness, who is now 45 years of age, has been in custody since his arrest in July 2009. ECF 169 at 1. He is currently incarcerated at FCI Berlin. *See Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/ (search by BOP Register Number 44514-037) (last accessed September 23, 2026).

The Court has received numerous letters from family and friends of the defendant. They have written in support of defendant's request for a reduction of his sentence. *See* ECF 179; ECF 183; ECF 185; ECF 194; ECF 211; ECF 212; ECF 212-2; ECF 212-3; ECF 212-4; ECF 215; ECF 217; ECF 218; ECF 219; ECF 220; ECF 221; ECF 222-5; ECF 223; ECF 224; ECF 225; ECF 229;

---

[10] "FOIA does not apply to federal courts because they are not 'agencies' subject to the statute's requirements. *See* 5 U.S.C. § 551(1)(B); *United States v. Casas*, 376 F.3d 20, 22 (1st Cir. 2004)." *United States v. Waters*, 2022 WL 17222205, at *1 n.* (4th Cir. Nov. 23, 2022) (per curiam).

[11] Bussard and Ruter were appointed to represent defendant pursuant to the Criminal Justice Act.

ECF 234; ECF 235; ECF 236.

No hearing is necessary to resolve the motions. *See* Local Rule 105.6; 28 U.S.C. § 2255(b). For the reasons previously stated, I shall deny the Status Motion (ECF 172), as moot. And, for the reasons that follow,[12] I shall deny the Motion (ECF 174, ECF 192, ECF 193, ECF 195, ECF 205, ECF 216, ECF 222, ECF 232), without prejudice. In addition, I shall deny the Motion to Reconsider (ECF 167), the Rule 12 Motion (ECF 199), and the Rule 60 Motion (ECF 200, ECF 213). However, I shall grant the Discovery Motions in part and deny them in part (ECF 155, ECF 158, ECF 196, ECF 226). Specifically, defendant's former counsel shall provide defendant with his case file(s), except as to documents provided by the government to counsel pursuant to the Discovery Agreement, discussed *infra*, and documents protected by the attorney work product doctrine.[13] And, the government shall be directed to provide its position as to the defendant's

[12] Generally, in specifying my rulings, I shall only reference docket entries that reflect open motions. This does not necessarily include letters from defendant that have been construed as motions.

[13] *Merriam-Webster Legal Dictionary* defines work product as "the set of materials (as notes), mental impressions, conclusion, opinions, or legal theories developed by or for an attorney in anticipation of litigation or for trial." *Merriam-Webster.com Legal Dictionary*, Merriam-Webster, https://www.merriam-webster.com/legal/work%20product. Accessed 27 Aug. 2026.

The work product doctrine protects "certain materials prepared by an attorney acting for his client in anticipation of litigation." *Hickman v. Taylor*, 329 U.S. 495, 508 (1947). Notably, "[t]he interests of society and the accused in obtaining a fair and accurate resolution of the question of guilt or innocence demand that adequate safeguards assure the thorough preparation and presentation of each side of the case." *United States v. Nobles*, 422 U.S. 225, 238 (1975). The work product doctrine is incorporated into the Federal Rules of Criminal Procedure. *See* Fed. R. Crim. P. 16(a)(2), (b)(2).

Both "fact" work product and "opinion" work product are protected by the doctrine. *See In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 174 (4th Cir. 2019) (quoting *In re Grand Jury Subpoena*, 870 F.3d 312, 316 (4th Cir. 2017). Opinion work product, which "represents the actual thoughts and impressions of the attorney," "enjoys a nearly absolute immunity." *Id.* (internal quotations omitted). Fact work product, which is "a transaction of the factual events involved," enjoys less protection, but discovery thereof is only allowed where a party demonstrates

request for a copy of ECF 65, which is currently filed under seal. The Discovery Motions are otherwise denied.

## I. Factual and Procedural Background

On direct appeal, the Fourth Circuit presented a comprehensive factual summary of the procedural history and the evidence presented at trial. *See United State v. Holness*, 706 F.3d 579 (4th Cir. 2013). Because it would be difficult to improve on the factual summary set forth in the opinion of the Fourth Circuit, and because it is not necessary for me to provide a fulsome review of the underlying facts, I shall incorporate by reference the Fourth Circuit's summary. I shall also incorporate the factual summary set forth in this Court's Memorandum Opinion of January 14, 2022. *See* ECF 170. In addition, I refer to the factual stipulation in the Presentence Report (ECF 169), as well as the factual stipulation in the case of *United States v. Campbell,* MJM-14-0058, ECF 27, involving defendant's accomplice.[14] I include here the facts that are helpful to provide context and the facts that are otherwise pertinent to the issues.

---

"both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship." *Id.* (internal quotations omitted).

To the extent that defense counsel rely on the work product doctrine to withhold a document or documents from defendant, they must provide the Court with a brief description of each such document.

[14] Campbell was indicted several years after the defendant was charged. In particular, Campbell was indicted on February 4, 2014, on the charge of having "traveled in interstate commerce with the intent to kill and injure" the spouse of Holness, resulting in a crime of violence, *i.e.,* the commission of murder, as defined in 18 U.S.C. § 1111(a), in violation of 18 U.S.C. § 2261(a)(1) and (b)(1). *Campbell,* ECF 1. Campbell entered a plea of guilty on July 28, 2014, pursuant to a plea agreement. *Id.,* ECF 27. The plea was tendered under Fed. R. Crim. P. 11(c)(1)(C), by which he and the government agreed to a sentence of 360 months of imprisonment (30 years). *Id.* ¶ 8. That term corresponded to the bottom of Campbell's advisory sentencing guidelines. *See id.*, ECF 70 at 6; *id.*, ECF 32 (PSR), ¶ 55.

Campbell's case was reassigned to me in October 2021. *See* Docket. While Campbell's case was assigned to me, I denied his motion for compassionate release (ECF 61), by

**A.**

Defendant was born in Jamaica in December 1980 and immigrated to the United States in 2001. ECF 169 ¶¶ 7, 70; *id.* at 2. He became a naturalized American citizen in 2003. *Id.* ¶ 70. Dunkley was born in Jamaica in 1982, and she and Holness were married in Jamaica in June 2003. *Id.* ¶ 8. At the time of the offense, Holness resided in Maryland and worked as an air traffic controller for the United States Navy. *Id.* ¶¶ 7, 23. Dunkley lived in New York. *Id.* ¶ 8.

Defendant and Dunkley "did not have a traditional marriage . . . ." *Id.* ¶ 73. They were cousins, *id.* ¶¶ 73, 74, and the marriage was largely regarded as one of convenience. Both Holness and Dunkley "derived mutual benefits as a result of the marriage." *Id.* ¶ 8. For example, Holness "received enhanced military housing allowance benefits by reporting that he was married." *Id.* Dunkley "received military health insurance coverage"; was "named a beneficiary on Mr. Holness' military group life policy"; and she "lived virtually rent free in the home owned by Mr. Holness' mother . . . in Brooklyn, New York." *Id.* But, "neither party ever denied the marriage." *Id.*

On July 2, 2009, the State of Maryland charged Holness with the murder of Dunkley. *See Holness*, 706 F.3d at 585. A federal indictment followed on November 24, 2009. ECF 1; *see Holness*, 706 F.3d at 587. On August 18, 2010, a Superseding Indictment was issued. ECF 19.

---

Memorandum Opinion and Order filed on November 21, 2022. *Id.*, ECF 70, ECF 71. There, I discussed the reason for the delay in Campbell's prosecution.

Specifically, I related that Holness was found to be the source of DNA recovered from duct tape found inside Holness's car after the murder. *Id.*, ECF 70 at 4. In addition, DNA of an unknown male was found in the vehicle. *Id.* However, the source of that DNA was not identified until late 2013. *Id.* at 5. Then, in January 2014, authorities in California notified the Maryland State Police that the DNA in question belonged to Campbell. *Id.* Campbell's indictment followed in February 2014. *Id.*, ECF 1.

Campbell's case was reassigned to Judge Matthew Maddox in May 2025. *See* Docket.

Then, on March 1, 2011, a Second Superseding Indictment was returned. ECF 42. It is the operative charging instrument.

As noted, Holness was charged in Count One with interstate travel with the intent to kill and injure his spouse, resulting in death, to wit, murder, in violation of 18 U.S.C. § 2261(a)(1). Count Two charged attempted obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2). In Count Three, Holness was charged with attempted intimidation and threatening of a witness, with the intent to influence, delay, or prevent an official proceeding, in violation of 18 U.S.C. § 1512(b)(1). And, Count Four charged defendant with the willful and knowing misuse of a United States passport, in violation of 18 U.S.C. § 1544. Judge Nickerson severed Count Four for trial. *See* ECF 28; ECF 69.

Following a trial held in March 2011 (ECF 68), the jury convicted Holness of Counts One, Two, and Three. ECF 93; ECF 94. But, with respect to Count Two, Judge Nickerson subsequently found that the jury instruction at issue was "inadequate . . . .", and he granted a new trial as to that charge. *See*, *e.g.*, ECF 98 at 4, 6. Thereafter, at sentencing on June 9, 2011 (ECF 101), the government moved to dismiss Count Two as well as Count Four, which had been severed. Judge Nickerson granted the motion. ECF 103 (Judgment), at 1; ECF 119 (Transcript of 6/9/11), at 31.

At trial, the government presented evidence that showed that, "[e]xactly seven months before [Dunkley's] murder, Holness masqueraded as [Dunkley] on-line using his roommates' laptop computer" and "obtained a $500,000 life insurance policy in the name of his wife and made himself the sole beneficiary." ECF 169, ¶ 23. Law enforcement matched the IP address on the life insurance policy to the IP address of the computer belonging to Holness's roommate. *Id.*

After defendant obtained the life insurance policy, he "devised a scheme to bring his wife from New York to Maryland with the intent to kill her." *Id.* Holness "required an accomplice to

drive [Holness's car] from the scene of the 'carjacking' and to contribute blood and DNA 'evidence'" at the murder scene. *Campbell,* ECF 27 at 10–11. Campbell and Holness knew each other since late 2002, when they served together in the Navy. *Id.* at 9. Holness arranged for Campbell to travel from Georgia to New York City to assist in the murder. *Id.* at 11.

On June 4, 2009, Holness and his wife traveled together from Brooklyn to Maryland. ECF 169, ¶ 23. "Once they arrived in Crumpton, Maryland, Holness and his accomplice killed [Dunkley], stabbing her 58 times, during the early morning hours of June 5, 2009." *Id.*[15] As Judge Nickerson described it, "Defendant attempted to make the murder appear to be the result of a carjacking . . . ." ECF 148 at 2.

Holness allegedly "told the police an elaborate tale to disguise his participation in the murder." ECF 164 at 2. And, he did so after signing a *Miranda* form. *Id.* At trial, the government introduced evidence that contradicted defendant's account. ECF 169, ¶ 24.

For example, Holness was observed in the vicinity of the Chester River at 5:00 a.m. on the date in question. *Id.* A K-9 also tracked defendant's scent to the river. *Id.* This contradicted defendant's claim that he never went to the river. *Id.* Moreover, the doctor who treated the defendant found no indication that defendant had been knocked unconscious, as he had claimed. *Id.* In addition, expert testimony confirmed that Holness's blood was found inside the vehicle, his DNA was found on duct tape in the vehicle, and chips resembling the victim's nail polish were found on Holness's clothing. *Id.* ¶ 25. Although Holness stated he had duct tape around his neck, expert testimony showed that there was no duct tape residue on defendant's clothes. *Id.* ¶ 24.

[15] As indicated, at the time of defendant's trial, the identity of the accomplice, Campbell, was not yet known to law enforcement.

The knife used in the murder was never recovered. *Id.* ¶ 15. But, Holness "told a witness that he discarded the knife." *Id.* ¶ 24.

At an unspecified time, "Holness wrote a third-party confession letter while incarcerated by state authorities," purporting to be from the "real killer." *Id.* ¶ 27. A handwriting expert confirmed that Holness wrote the letter. *Id.*

Holness asked his cellmate, S.M., to "mail the letter to the Washington Post in order to obstruct the official investigation in this case." *Id.* When Holness learned that S.M. "cooperated with law enforcement," he "wrote the words 'rat' and 'snitch' with [S.M.'s] name, home phone number, and home address on the walls of the Kent County Detention Center," with the intention of "intimidat[ing] and influenc[ing]" S.M.. *Id.*

The PSR (ECF 169) reflected that defendant's conviction under Count One was subject to a base offense level of 18, under § 2A6.2(a) of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"). *Id.* ¶ 33. However, because defendant's conduct resulted in Dunkley's death, under U.S.S.G. § 2A6.2(c)(1), the first degree murder cross reference applied under U.S.S.G. § 2A1.1. *Id.* It called for a base offense level of 43. *Id.* Accordingly, defendant's adjusted offense level for Count One was 43, *i.e.*, the highest possible offense level. *Id.*

With respect to Count Three, attempted witness intimidation, Holness was subject to a base offense level of 14, pursuant to U.S.S.G. § 2J1.2(a). *Id.* ¶ 39. However, eight levels were added, pursuant to U.S.S.G. § 2J1.2(b)(1)(B), because Holness's conduct involved threatening to cause physical injury to a person. *Id.* ¶ 40. Therefore, the adjusted offense level for Count Three was 22. *Id.* ¶ 44. And, under the multiple-count adjustment (*id.* ¶¶ 45–50), defendant had a total offense level of 43. *Id.* ¶ 52.

Given that defendant had no prior criminal convictions, his criminal history category was I. *Id.* ¶ 55. Nevertheless, the Guidelines called for a sentence of life imprisonment. *Id.* ¶ 61.[16]

As noted, defendant was born in Jamaica in December 1980. ECF 169 at 2. He graduated from high school in 1999, and was thirty years of age at sentencing on June 9, 2011. *Id.*; *see also id.* ¶ 79. According to the PSR, Holness's parents separated when he was three years old and he was "primarily raised by his mother." *Id.* ¶ 69.

Holness reported that he "never had any mental or emotional health problems. . . ." *Id.* ¶ 75. Holness also maintained that his "overall physical health [is] 'good,'" and he "denied receiving any medical treatment or taking any prescription medications." *Id.* ¶ 76. He also "denied any use of illegal substances." *Id.* ¶ 78.

Between February 2002 and January 2010, "the defendant was enlisted in the United States Navy," where he was "trained as an air traffic controller." *Id.* ¶ 80. "Prior to his discharge in January 2010, the defendant had attained the rank of Petty Officer Second Class (E-5)." *Id.*

Defendant is the father of two children, born to two different mothers. *Id.* ¶¶ 71, 72. At sentencing, his daughter was seven years old and his son was six. *Id.* Holness spoke of his children with affection. ECF 119 at 27.

After sentencing, Holness timely appealed to the Fourth Circuit. ECF 105. The Fourth Circuit affirmed on February 11, 2013. ECF 121; *see Holness*, 706 F.3d 579.

On appeal, defendant contended that Judge Nickerson erred by declining to suppress evidence obtained in violation of defendant's Sixth Amendment right to counsel. ECF 121 at 3. Judge King, writing for a unanimous panel, rejected that contention, but noted that "the record

---

[16] In contrast, Campbell received deductions for acceptance of responsibility based on his plea of guilty. That accounts for the difference in the Guidelines for defendant and Campbell.

indicate[d] a potential abridgement of [defendant's] privilege against self-incrimination and concomitant right to counsel, as secured by the Fifth Amendment." *Id.* Nonetheless, the Court observed that "any Fifth Amendment error was harmless beyond a reasonable doubt." *Id.*

Defendant submitted a petition for rehearing and rehearing en banc, which the Fourth Circuit denied by Order of March 11, 2013. ECF 123. The mandate issued on March 19, 2013. ECF 127. Thereafter, Holness sought a writ of certiorari to the Supreme Court, which was denied. *United States v. Holness,* 571 U.S. 867 (2013).

On September 29, 2014, Holness, pro se, moved to vacate his conviction, pursuant to 28 U.S.C. § 2255, alleging ineffective assistance of counsel. *See* ECF 132. Judge Nickerson denied the motion by Memorandum (ECF 148) and Order (ECF 149) of March 27, 2017. Thereafter, Holness noted an appeal to the Fourth Circuit. ECF 150. However, the Court declined to issue a certificate of appealability and dismissed the appeal. ECF 153. Defendant then petitioned the Supreme Court for a writ of certiorari, which was denied by Order of May 16, 2018. *See* Docket.

Holness, again pro se, filed a motion for compassionate release on September 28, 2020, pursuant to 18 U.S.C. § 3582(c)(1)(A). *See* ECF 160; ECF 168.[17] There, Holness indicated that his underlying medical conditions rendered him particularly vulnerable to COVID-19 and warranted his release from prison. ECF 160 at 8. The government opposed Holness's motion. ECF 164. By Memorandum Opinion and Order of January 14, 2022, I denied defendant's motion. *See* ECF 170; ECF 171.

**B.**

As noted, Holness was indicted on November 24, 2009. ECF 1. The FPD was initially appointed to represent Holness. ECF 228 at 1. However, in December 2009, Alan Bussard was

[17] On October 14, 2020, the FPD declined to supplement the Motion. ECF 162.

appointed to represent the defendant. ECF 10; Docket. Then, on September 23, 2010, Gerald Ruter was appointed to serve as co-counsel. ECF 27.

In December 2017, Holness wrote to the Court, requesting "production or inspection of court records, and evidence, pursuant to 28 U.S.C. § 753(f) and 28 U.S.C. § 2250, and any other provision of law applicable.[]" ECF 155. In particular, Holness requested "all exculpatory evidence regarding Mr. Cambell [sic] including but not limitted [sic] to the plea colloquy; sentencing transcripts; statements made to Maryland State Police and FBI; and tangible evidence." *Id.* at 2. Holness claimed that discovery was warranted to allow him "to pursue claims based on newly discovered evidence based on actual innocense [sic] in the death of Serika Dunkeley [sic] that was not previously available." *Id.* at 3. About a year and a half later, Holness supplemented his request with a letter to the Court requesting additional documents "relevant to his criminal prosecution and defense", including his arrest warrant and the court docket sheet. ECF 156.

The Administrative Assistant to the Staff Attorney's Office for the District of Maryland responded to defendant, advising that the docket sheet had been sent to the Warden of Holness's institution at the time, FCI Allenwood. ECF 157. The Administrative Assistant also stated, *id.*:

> If you would like copies of your previous filings, please send a request noting the ECF numbers from the docket sheet provided. There is a $.10 per page fee for copy work and a $11.00 fee for certifying a document. Once you have submitted a request, a letter will be provided stating the monies due for the copy work. If you cannot afford the fee, you may submit a motion for copy work at the expense of the government.

In addition, the Administrative Assistant appended a copy of a letter she sent to the Warden of FCI Allenwood, where defendant was incarcerated. ECF 157-1. She informed the Warden that the Court had "received a request for materials related to a federal case from an inmate housed at your facility." *Id.* The Administrative Assistant explained: "This Court has a policy of responding to inmate requests for such documents by sending them only to the Warden of the facility in which

they are confined." *Id.* Therefore, the Administrative Assistant asked the Warden to "make the materials available to the inmate through your office or appropriate staff." *Id.*

On June 1, 2022, Holness again wrote to the Court, pursuant to the Freedom of Information Act, 5 U.S.C. § 552, requesting numerous documents, including the date and time the grand jury began its investigation, the date the grand jury was impaneled, and his arrest warrant. ECF 176. The Administrative Assistant again responded. ECF 178. She informed Mr. Holness that the docket sheet from his case had been sent to the Warden at FCI Ray Brook, where defendant was then incarcerated. *Id.* The letter also included instructions for Mr. Holness on how to access the docket and payment instructions, should he want a copy of any court filings. *Id.* A letter was also sent to the Warden, asking him to make the documents available to Mr. Holness. ECF 178-1.

Mr. Holness responded. ECF 182. He requested "a copy of the court policy, that says that the clerk has to send his legal documents to the prison's warden, then instructs them not to give him his legal documents, only for review." *Id.* Holness also asked for the following documents: "ECF No: 1, 2, 3, 4, 17, 20, 43, 56, 65, 72 (Motion to dismiss indictment and for discovery) 91, 96, 98, and his previous requests." *Id.*

The Administrative Assistant answered the defendant. ECF 184. She advised that defendant's "Indictment (ECF 1), Response (ECF 17), Jury Note (ECF 91), Motion for Judgment of Acquittal (ECF 96) and Memorandum and Order (ECF 98) have been sent to the warden[.]" *Id.* Moreover, she instructed Mr. Holness to "contact the appropriate staff so that the material may be made available for [his] review." *Id.* The Administrative Assistant also explained that any document that was not provided to the Warden was withheld because "it is not available to him", noting that sealed documents and Court minutes are not available for his review. *Id.*

On November 6, 2023, Holness filed a "Motion to for [sic] Evidentiary Hearing and to Compel Discovery." ECF 196. He asked the government to provide: "All discovery, including all brady [sic] material. All communication between the U.S. Attorney's office and Maryland State Police. All communication between the U.S. Attorney's office and defense Attorneys. All communication between Dellando Campbell and all statements from Campbell." *Id.* Holness also requested that his former attorneys turn over his case file. *Id.* Further, Holness asked the Court to "unseal his whole case, because there should be no reason why it should be" sealed, noting that his "health complications are no risk to national security or the public." *Id.* Holness claimed that he needed these documents "to prove misconduct and irregularities to his judicial process." *Id.* According to Holness, "[t]he pre-existing record is inadequate to permit a thorough and complete understanding of the material facts pertinent" to his Rule 60(b) motion. *Id.* In addition, he asked the Court to "compel the clerk of the court to fix his docket sheet to reflect no skipped entries as required by federal court rules and if there is a miscellaneous docket sheet, any such docket sheet should be sent to him immediately." *Id.*

Holness again wrote to the Court on November 22, 2023, seeking discovery as to his case, "whether pre-trial or post trial." ECF 198. Holness stated that he had "requested this information from the previous court, the united states attorney's office, defense counsels [sic] and from freedom of information" but had "been unsuccessful." *Id.* Defendant expressed concern that his motions for relief under Fed. R. Civ. P. 60(b) and Fed. R. Civ. P. 12(h)(3) were "missing[.]" *Id.* Moreover, Holness indicated that "something" was "off" about the way his case was adjudicated. *Id*. Specifically, he noted that his "indictment and the two superseding indictments" are "missing the for-person [sic] signature" and that his "docket sheet has . . . missing entries." *Id*. Holness

asserts that he "asked the clerk of the court to fix this and to send" him the "documents" from "these entries." *Id.*

In October 2025, defendant filed a "Motion To Compel Attorney To Surrender Case File Motion For The Production of Attorney's Case File." ECF 226. He asked the Court to compel the "“production of his case file in it's [sic] entirity [sic], from his trial attorneys Alan R L Bussard and Gerald C Ruter." *Id.* at 1. Holness also provided the Court with a copy of a letter from Bussard dated August 18, 2025. ECF 226-1.

According to Holness, he "has requested his case file" from his former counsel "numerous times over the years, both via phone and in writing." ECF 226. He claims that his former counsel "either did not respond or denied his request." *Id.* Holness maintains that his attorneys have justified withholding his case file by claiming "that they have entered into a discovery agreement with the government" that "prohibits Holness from having his discovery and must be supervised with it." *Id.* However, Mr. Holness complains that his attorneys "did not consult" him "at anytime[ sic] about" such an agreement. *Id.* at 1. Moreover, he claims that he has never seen it. *Id.*

Pursuant to the Court's request of October 7, 2025 (ECF 227),[18] Ruter and Bussard responded to Holness's motion to compel the production of his case file. *See* ECF 228. They posit, *inter alia*, that the Court's Standing Order 2020-01 prohibits Holness from accessing

[18] ECF 226 and ECF 226-1 were filed under seal. The Court also sealed its letter of October 7, 2025. ECF 227. In my letter, I asked the parties to advise the Court as to the need for sealing. *Id.* at 2. The Court also said: "If I do not receive an objection to unsealing of the Motion [*i.e.*, ECF 226] and this letter by **November 7, 2025**, I shall direct the Clerk to unseal both." *Id.* (Emphasis in ECF 227). No response was docketed. Therefore, I shall direct the Clerk to unseal ECF 226, ECF 226-1, and ECF 227.

discovery materials, absent government consent or court order. *Id.* at 4.[19] Former defense counsel also reference Standing Orders 2012-10, 2015-04, and 2019-06 to describe other orders adopted by the District of Maryland to govern "the disclosure of sensitive information that could lead to violence and murder." *Id.* at 5.

Further, defense counsel recall that Bussard "obtained a limited number of documents from the State Public Defender related to the government's investigation", including the Statement of Charges. ECF 228 at 1. Bussard met with Holness on November 30, 2009. *Id.* at 2. In this regard, I note that Holness had an initial appearance on December 1, 2009. ECF 5. And, on December 8, 2009, he had a detention hearing. ECF 228 at 2; *see* ECF 8.

That same day, Bussard and Kwame J. Manley, an Assistant United States Attorney assigned to the case, executed a discovery agreement. ECF 228 at 2. Counsel submitted a copy of the agreement as an exhibit. *See* ECF 228-2 ("Discovery Agreement"). The Discovery Agreement, dated December 8, 2009, states, in part: "All discovery materials will be produced [by the government] on the condition that they will remain in your custody and control, and they ***will not be disseminated to anyone outside your office, absent prior approval of this office.*** . . ." *Id.* at 2 (emphasis added).

Moreover, former defense counsel assert that "it was customary for the government to present counsel with a proposed Discovery Agreement at the time of the Initial Appearance or Detention Hearing so that production of discovery could be expedited." ECF 228 at 2. They also claim that it was "undersigned counsel's usual practice to discuss the [Discovery] Agreement with every client during early contacts with client." *Id.* But, they do not specifically indicate whether

[19] Standing Order 2020-01 is titled "In Re: Discovery In Criminal Cases." It governs the discovery process between the government and a defendant in a criminal case, if both sides do not reach an agreement on their own.

Bussard discussed the Discovery Agreement with Holness before it was executed. *Id.* In any event, defense counsel claim that, within a week of the execution of the Discovery Agreement, the government began producing discovery. *Id.*

Former defense counsel recall one occasion when Holness asked about discovery. *Id.* at 2–3. They assert that on March 8, 2011, after they met with the defendant, they "contacted Assistance [sic] United States Attorney, Jack Purcell, and referenced a request by Mr. Holness for release of discovery materials." *Id.* at 3. Holness disputes this account. ECF 231 at 2.[20]

Former defense counsel submitted a copy of the email exchange between Bussard and government counsel on March 8, 2011. *See* ECF 228-3. Bussard wrote, *id.*:

> Gentlemen, Mr. Holness has requested that I give him the discovery materials to review. I refused. He then requested that I ask you for permission to share the materials with him. Thus, the purpose of this e-mail. Thanks.

AUSA Purcell responded. He stated, *id.*: "Sorry, but no. In court, of course, or at the jail." Trial began soon after, on March 14, 2011. *See* ECF 68.

According to former defense counsel, Holness requested his case file from them via letters dated July 17, 2025, and August 8, 2025. ECF 228 at 3. Mr. Bussard and Mr. Ruter conferred and "agreed that release of the requested materials was conditioned on receiving permission from the government." *Id.* Therefore, Mr. Bussard and Mr. Ruter "conferred with Michael Hanlon, Chief of the Criminal Division at the United States Attorney's Office, who refused to grant the defense request." *Id.* They have submitted a copy of their email correspondence with government counsel. *See* ECF 228-4 ("Hanlon Email").

[20] My decisions regarding the discovery issues are not based on the credibility of any witness or party.

The Hanlon Email, dated August 7, 2025, reflects the following exchange between Bussard and Hanlon, *id.* (alterations added):

> [Bussard]: Hi Mike, hope your Summer is going well. I was trying to contact you in your capacity as criminal supervisor regarding a request by Mr. Holness to obtain his discovery . . . . Your office was represented by Jack Purcell and Kwame Manley . . . . Holness is serving a life sentence. Apparently, Holness wants to file a 2255 although a review of the docket seems to indicate that he already filed one several years ago. I have not pulled my file out of storage but Gerry [Ruter] and I assume there was a standard discovery agreement in place. We want to get the government's position before responding to Mr. Holness . . . .
>
> [Hanlon]: Alan – Thanks for reaching out. I hope you and Gerry [Ruter] are both doing well also.
>
> Assuming that this case involves our standard discovery letter, the government would NOT authorize for Mr. Holness to receive a copy of his discovery himself.

By letter of August 18, 2025 (ECF 226-1), Mr. Bussard responded to Mr. Holness's requests of July 17, 2025 and August 8, 2025. He advised Holness that Michael Hanlon, Chief of the Criminal Division of the U.S. Attorney's Office, would not agree to provide defendant with a copy of the discovery. *Id.* But, Bussard also told Holness, *id.*: "This would not prevent your review of the discovery at your current BOP facility or at the Court . . . ." However, Bussard did not explain how those options could be accomplished, given defendant's incarceration.

Holness replied to ECF 228. *See* ECF 231. He asserts that the Discovery Agreement "is unlawful and was entered into without his knowledge or consent, and he would never have agreed to such a deal." *Id.* at 2. Further, he asserts that this Court's "standing orders are in violation of due process and federal Court Rules." *Id.*[21] Holness also alleges that "the discovery case file could contain possible Brady and Giglio material evidence." *Id.* at 3.

[21] Holness does not specify which Standing Order he was referencing. *See* ECF 231.

Moreover, Holness complains that before trial, "counsel barely showed him or went over any discovery with him." *Id.* at 2. Indeed, Holness claims that he "requested a continuance for this very reason." *Id.* According to Holness, "[t]he transcripts will show Mr. Bussard never objected to the fact that he never visited Holness to show him or strategize the material evidence . . . Nor did he deny that he never went over evidence with Holness during or at the end of trial days." *Id.* (citing ECF 231-1 at 3–7).

In addition, Holness asserts "prosecutorial misconduct." ECF 231 at 1. He complains, *inter alia*, that the government "lied" about the reason for its interest in this case and about his "relationship" to the victim. *Id.* at 3.

Defendant has provided an excerpt from the transcript of the first day of his trial, March 14, 2011, to support his discovery contentions. ECF 231-1 at 3-7; *see also* ECF 68; ECF 109 (transcript, 3/14/11). The transcript (ECF 109) reflects that on the morning of trial, Holness asked his lawyers to move for a continuance. *Id.* at 2. In particular, Holness asked his attorneys to advise the court "that he has not had adequate time to spend with [Mr. Ruter] and with Mr. Bussard prior to today's proceedings and prior to the commencement of the trial itself." *Id.* at 5.

Mr. Ruter told Judge Nickerson the following, in part: "Mr. Bussard and I have, indeed, met several times with Mr. Holness. Mr. Bussard many, many more times than myself since I entered the case only in the latter part of 2010." *Id.* Ruter also advised: "[A]lthough I had very much wished to see Mr. Holness in the last few weeks prior to trial, I was not able to do so because I was in a different trial that just ended last Wednesday[.]" *Id.*

Ruter also noted that Holness had presented him with thirty to forty pages of handwritten notes, referencing fifty or more cases that defendant "thought were important for counsel to review before motions were argued or before the trial commenced." *Id.* at 6. Ruter claimed that he had

looked at the cases that morning but found that a "lot of what Mr. Holness has noted in his notes deals with matters which clearly would not be appropriate for the filing of certain federal motions." *Id.*

Ruter continued, *id.* at 8–9 (emphasis added):

> I do feel badly for Mr. Holness, Your Honor. I say that because had I not been in trial the last two weeks and then in preparation a week prior, I indeed would have seen him, if not once, at least twice, because that's my habit, because he deserves that, as any defendant does who's charged with a serious crime in these courts. *But I cannot say that we're not prepared to proceed today.*

The government opposed the motion for a postponement. *Id.* at 9. It argued "that Mr. Bussard was not in trial and he's had every opportunity to be with Mr. Holness for the entire time period." *Id.*

Judge Nickerson denied the postponement request. *Id.* He reasoned that Holness had "been assigned two counsel, both senior attorneys with considerable experience . . . . Mr. Bussard has been available to Mr. Holness. Mr. Ruter has also been available, although temporarily in the last three or four weeks not as available as Mr. Holness would have liked. Certainly clear to the Court that Mr. Holness's rights have not been so prejudiced by this that it would warrant a continuance." *Id.*

Additional facts are included, *infra.*

## II. Discussion

As discussed, Mr. Holness has filed numerous motions. I have categorized the motions as follows: (1) Motion for Compassionate Release, *i.e.*, the Motion (ECF 168; ECF 172; ECF 174; ECF 192; ECF 193; ECF 205; ECF 222; ECF 232); (2) Motion to Reconsider (ECF 167); (3) Rule 12 Motion (ECF 199); (4) Rule 60 Motion (ECF 200; ECF 213); and (5) Discovery Motions (ECF 155; ECF 158; ECF 176; ECF 196; ECF 226; ECF 231). I sometimes refer to ECF 200, and ECF 213 collectively as the Motion to Vacate. I shall address each motion, in turn.

### A. Motion for Compassionate Release

#### 1. 18 U.S.C. § 3582(c)

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Smith*, 2026 WL 509318, at *1 (4th Cir. Feb. 24, 2026) (per curiam); *United States v. Moody*, 115 F.4th 304, 310 (4th Cir. 2024); *United States v. Davis*, 99 F.4th 647, 653 (4th Cir. 2024); *United States v. Brown*, 78 F.4th 122, 128 (4th Cir. 2023); *United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson*, 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020), *abrogated on other grounds by United States v. Troy*, 64 F.4th 177 (4th Cir. 2023); *United States v. Jackson*, 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman v. United States*, 564 U.S. 522, 526 (2011). One such exception is when the modification is "expressly permitted by statute." *See* 18 U.S.C. § 3582(c)(1)(B); *see also Jackson*, 952 F.3d at 495.

A statutory exception is codified at 18 U.S.C. § 3582, which was first enacted as part of the Sentencing Reform Act of 1984. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). It is commonly termed the "'compassionate release exception.'" *Moody*, 115 F.4th at 310; *see United States v. Osman*, 2024 WL 3633573, at *3 (4th Cir. Aug. 2, 2024) (per curiam) (unreported) (stating that a motion under § 3582(c)(1)(A) is "commonly referred to as a motion for compassionate release. . . ."). Specifically, 18 U.S.C. § 3582(c)(1)(A)(i) authorizes a court, in its discretion, to reduce a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction;" "such a reduction is consistent with applicable policy statements issued by the

Sentencing Commission"; and the court has considered the factors under 18 U.S.C. § 3553(a). *See* 18 U.S.C. § 3582(c)(1)(A); *see also Fernandez v. United States,* 608 U.S. 411, 146 S.Ct. 1292, 1302, 1304 (2026); *United States v. Reese*, 2026 WL 2211212, at *1 (4th Cir. July 31, 2026) (per curiam); *United States v. Washington*, 161 F.4th 816, 818 (4th Cir. 2025); *United States v. Crawley*, 140 F.4th 165, 169 (4th Cir. 2025); *Hargrove*, 30 F.4th at 194.

As originally enacted, the compassionate release provision permitted a court to alter a sentence only upon motion made by the Director of the BOP. *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984). This meant that a defendant seeking compassionate release had to rely on the BOP Director for relief. *See Bethea*, 54 F.4th at 831; *see*, *e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866–67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP). However, the safety valve of § 3582 languished, because the BOP rarely filed such a motion on an inmate's behalf. As a result, compassionate release was an infrequent occurrence. *See Hr'g on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

In 2018, with the passage of the First Step Act, *see* Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)), Congress "broadened" the authority of courts to grant sentencing modifications pursuant to 18 U.S.C. § 3582. *Malone*, 57 F.4th at 173. The 2018 FSA was "a landmark piece of legislation that changed the federal criminal-sentencing system in numerous respects." *Hewitt v. United States*, 606 U.S. 419, 424 (2025).

Of relevance here, the 2018 FSA authorizes a court to grant compassionate release "upon

motion of the Director of [BOP], or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first. 18 U.S.C. § 3582(c)(1)(A); *see Ferguson*, 55 F.4th at 268; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *see also United States v. McCoy*, 981 F.3d 271, 276 (4th Cir. 2020), *abrogated on other grounds by Rutherford v. United States*, 608 U.S. 454, 146 S. Ct. 1320 (2026). In other words, a federal inmate is now able to file a motion for compassionate release directly with the court, as long as the inmate first exhausts administrative remedies. *McCoy*, 981 F.3d at 275–76.[22]

Notably, a defendant is "not entitled to compassionate release as a matter of right." *United States v. Holley*, 179 F.4th 985, 989 (4th Cir. 2026). In *Rutherford*, 146 S. Ct. 1320, and *Fernandez*, 146 S. Ct. 1292, both decided on May 28, 2026, the Supreme Court addressed the standard for compassionate release.

The Supreme Court said in *Rutherford*, 146 S. Ct. at 1330: "The compassionate release provision empowers a district court to 'reduce the term of imprisonment' if it finds, among other things, that 'extraordinary and compelling reasons warrant such a reduction.'" (Quoting 18 U.S.C. § 3582(c)(1)(A)(i)). Similarly, in *Fernandez*, 608 U.S. 411, 146 S. Ct. at 1302, the Court observed that "Congress made compassionate release available only when 'extraordinary and compelling reasons' justify it." And, said the Court, this "is a demanding standard." *Id.*

[22] If a defendant has already exhausted administrative remedies upon filing a first motion for compassionate release, and later seeks to renew the motion, the defendant need not meet the bar for exhaustion a second time. *United States v. King*, 2025 WL 1692747, at *1 (4th Cir. June 17, 2025) (unreported).

*Rutherford* implicated a provision in the 2018 FSA that eliminated the "25-year stacking requirement for first-time offenders [under 18 U.S.C. § 924(c)]: A 25-year consecutive sentence is now required only for a 'violation . . . that occurs after a prior conviction . . . has become final.'" *Rutherford*, 146 S. Ct. at 1327 (some quotation marks omitted; first and third alterations added).

In *Rutherford*, the defendants, Rutherford and Carter, had been convicted of multiple firearms offenses under 18 U.S.C. § 924(c). They sought compassionate release on the ground that, in the 2018 FSA, Congress enacted a nonretroactive change to the statutory scheme, eliminating the stacking of mandatory minimum penalties for first-time offenders. As a result, this created sentencing disparities between former and current offenders. In particular, a defendant sentenced after the change in the law would face a substantially lower mandatory minimum sentence as compared to a similarly situated defendant sentenced before the change in the law. *Id.* at 1327. Defendants complained that their sentences were "'unusually long'" in light of the congressional determination that the § 924(c) stacking provision was "too punitive." *Id.* at 1329 (citation omitted). In defendants' view, the sentencing disparities constituted an extraordinary and compelling ground for compassionate release. *Id.* at 1327, 1329.

As the Supreme Court noted, defendant Rutherford "earned" a 32-year minimum sentence under § 924(c), *id.* at 1326, with a total sentence over 42 years. *Id.* at 1326-27. Defendant Carter's § 924(c) term was 57 years out of a total sentence of 70 years. *Id.* at 1327. However, if sentenced today, Rutherford's mandatory minimum would have been fourteen years, and Carter's would have been twenty-one years. *Id.* at 1327.

Nevertheless, the *Rutherford* Court concluded that the sentencing disparities created by the nonretroactivity of the change in the law did not constitute an extraordinary and compelling reason warranting compassionate release. *Id.* at 1330. The Court explained, *id.*: "The term

'extraordinary' means 'most unusual,' 'far from common,' or 'having little or no precedent.'" (Quoting Webster's Third New International Dictionary 807 (1976)); *see Fernandez*, 146 S. Ct. at 1302. And, the Court defined "Compelling" as "'tending to convince or convey by or as if by forcefulness of evidence.'" *Rutherford*, 146 S. Ct. at 1330 (citation omitted). The *Rutherford* Court added: "Putting these definitions together, 'extraordinary and compelling' reasons for compassionate release are those that are especially unusual and convincing." *Id.* The Court underscored that although "the terms 'extraordinary' and 'compelling' leave room for judgment, they are not so flexible as to encompass any consideration." *Id*. It said, *id.*: "Their meaning depends on context: A reason is 'extraordinary' and 'compelling' only if it is sufficiently unusual and convincing to 'warrant' compassionate release." *See also Fernandez*, 146 S. Ct. at 1307.

Moreover, the *Rutherford* Court reasoned, 146 S. Ct. at 1330: "When Congress declines to make a sentencing amendment retroactive, the fact that a preamendment sentence is longer than it would have been postamendment is not an 'extraordinary and compelling reaso[n]' that 'warrant[s]' a sentence reduction." (Alterations in *Rutherford*). The Court added, *id.* at 1331: "It would also fall well outside the heartland of compassionate release, which has long been defined by a prisoner's personal circumstances," if nonretroactive sentencing amendments were to constitute a ground for compassionate release. In the Court's view, reducing a sentence on this basis "would undermine Congress's choice to leave the sentence intact." *Id.* [23]

[23] *Rutherford* may appear at odds with *Concepcion v. United States*, 597 U.S. 481 (2022). *Concepcion* involved § 404(a) of the First Step Act, which authorizes a reduction of sentence for defendants convicted of certain crack cocaine offenses. In that case, the Court repeatedly recognized the "wide discretion" of the sentencing judge "to craft appropriate sentences." *Id.* at 486; *see*, *e.g.*, *id*. at 492 (recognizing, *inter alia*, the "unbroken tradition" that "characterizes federal sentencing . . . ."]; *id.*at 490-91, 493. The Supreme Court concluded that a district court's general obligation "to consider [all] nonfrivolous arguments presented by the parties," *id.* at 487, required it "to consider intervening changes of law or fact in exercising [its] discretion to reduce a sentence pursuant to the First Step Act." *Id.* at 500. However, the *Concepcion* Court

*Fernandez*, 146 S. Ct. 1292, is also noteworthy. There, the Court made clear that compassionate release is not "a vehicle for attacking the validity of a conviction . . . ." *Id.* at 1304. In other words, a defendant "cannot deploy § 3582 to blunt what he perceives to be the sharp edges of § 2255." *Id.* Accordingly, § 3582 "is not a suitable vehicle" for a § 2255 claim. *Id.* at 1305.

Under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are satisfied. *Brown*, 78 F.4th at 128; *Bethea*, 54 F.4th at 831. Specifically, "the district court must conduct a two-step analysis." *United States v. Centeno-Morales*, 90 F.4th 274, 279 (4th Cir. 2024); *see also Bond*, 56 F.4th at 383.[24]

The first step consists of two parts. The court "must determine: (1) whether extraordinary and compelling reasons warrant . . . a [sentence] reduction; and (2) that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Malone*, 57 F.4th at 173; *see United States v. Pittman*, 2026 WL 1985360, at *1 (4th Cir. July 9, 2026) (per curiam); *United States of America v. Spruill*, 2026 WL 1650983, at *1 (4th Cir. June 8, 2026) (per curiam); *United States v. Blancher*, 2026 WL 1587515, at *1 (4th Cir. June 3, 2026) (per curiam); *United States of America, v. Williams,* 2026 WL 752605, at *1 (4th Cir. Mar. 17, 2026) (per

---

acknowledged that "Congress or the Constitution [may] limit[ ] the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence. . . ." *Id.* at 486–87. "Thus," the Court noted, "Congress expressly cabined district courts' discretion [to reduce a sentence] by requiring courts to abide by the Sentencing Commission's policy statements." *Id.* at 495.

*Rutherford* distinguishes *Concepcion*, stating that *Concepcion* was decided "under a different provision of the Act." *Rutherford*, 146 S. Ct. at 1333. In *Rutherford*, the question was whether the prisoner was eligible for compassionate release in the first instance, whereas in *Concepcion* it was undisputed that the defendant qualified for a sentence reduction. *Id.*

[24] The Fourth Circuit has said that there are two criteria, and that the first criterion consists of two steps. *See*, *e.g.*, *Malone*, 57 F.4th at 173. But, in *Crawley*, 140 F.4th at 169, the Fourth Circuit stated that there are three criteria. Whether the criteria are counted as two or three, the substance is the same.

curiam); *United States v. Boyd*, 2026 WL 595579, at *1 (4th Cir. Mar. 3, 2026) (per curiam); *Smith,* 2026 WL 509318, at *1; *United States v. Johnson*, 2026 WL 237729, at *1 (4th Cir. Jan. 29, 2026) (per curiam); *United States v. Pope*, 2026 WL 207491, at *1 (4th Cir. Jan. 27, 2026) (per curiam); *see Moody*, 115 F.4th at 310; *Davis*, 99 F.4th at 653; *Bond*, 56 F.4th at 383; *Bethea*, 54 F.4th at 831; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, 142 S. Ct. 383 (2021). The court's analysis of these two parts goes hand in hand. *United States v. Burleigh*, 145 F.4th 541, 547 (4th Cir. 2025). If that first step is met, the court then proceeds to the second step.

Under the second step, the court must determine whether release is appropriate in light of the sentencing factors in 18 U.S.C. § 3553(a), "to the extent those factors are applicable." *Bethea*, 54 F.4th at 831; *see United States v. Callaham*, 2026 WL 2169113, at *1 (4th Cir. July 28, 2026) (per curiam); *Pittman*, 2026 WL 1985360, at *1; *Williams,* 2026 WL 752605, at *1; *Moody*, 115 F.4th at 310; *Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647; *Kibble*, 992 F.3d at 330. "Importantly, a court assessing a compassionate release motion is entitled to consider the § 3553(a) factors '[o]nly after' conducting the first step's analysis." *Osman*, 2024 WL 3633573, at *4 (citations omitted) (alteration in *Osman*); *see Malone*, 57 F.4th at 173 (stating that the district court may consider the § 3553(a) sentencing factors only after determining that extraordinary and compelling reasons warrant a sentence reduction and that a reduction is consistent with the Sentencing Commission's policy statements).

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021), *superseded by regulation as stated in Davis*, 99 F.4th 647. Notably, "it weighs against an abuse of discretion—and is viewed

as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Smith,* 2026 WL 509318, at *2; *Washington*, 161 F.4th at 820; *United States v. Gutierrez*, 2023 WL 245001, at *5 (4th Cir. Jan. 18, 2023) (unreported); *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.

But, the Fourth Circuit has recognized that, "when deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)); *see Davis*, 99 F.4th at 653–54. If there is no applicable policy statement relating to the defendant's compassionate release motion, the court has discretion to make its "own independent determination of what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A)." *Burleigh*, 145 F.4th at 548 (cleaned up); *see also United States v. Johnson*, 143 F.4th 212, 215 (4th Cir. 2025) (explaining that, "[i]n the absence of an applicable policy statement, district courts" have the power to "consider *any* extraordinary and compelling reason for release") (cleaned up) (emphasis in original).

The Policy Statement codified at U.S.S.G. § 1B1.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A)" ("Policy Statement"). "[U]ntil recently," that provision did not apply to motions filed by prisoners. *Davis*, 99 F.4th at 654; *see McCoy*, 981 F.3d at 281. The Policy Statement began: "Upon motion *of the Director of the Bureau of Prisons* under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." (Emphasis added). Interpreting this language, the Fourth Circuit said in *McCoy*, 981 F.3d at 282, that, "[b]y its plain terms . . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." Therefore, on the basis of that earlier text, the *McCoy* Court held: "When a defendant exercises his . . . right

to move for compassionate release on his own behalf, . . . § 1B1.13 does not apply, and thus § 3582(c)(1)(A)'s consistency requirement does not constrain the discretion of district courts." *Id.* (citation omitted). As a result, district courts were "empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *Id.* at 284 (citation omitted).

Effective November 1, 2023, U.S.S.G. § 1B1.13 was amended. *See Davis*, 99 F.4th at 654 (citing 88 Fed. Reg. 28254 (May 3, 2023)). The Policy Statement now begins: "Upon motion of the Director of the Bureau of Prisons *or the defendant* pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment . . . ." U.S.S.G. § 1B1.13 (2023) (emphasis added). Therefore, the Policy Statement is applicable to defendant-filed motions under § 3582(c)(1)(A). *Davis*, 99 F.4th at 658 (directing district court on remand "to revisit [the petitioner's] arguments in light of the Sentencing Commission's new policy statement outlining when and how to consider changes in law as an extraordinary and compelling reason for a reduction"). As a result, when a defendant files a motion for compassionate release, a court must ensure that any sentence reduction "is consistent with" the Policy Statement's provisions. 18 U.S.C. § 3582(c)(1)(A). And, the court should apply the Policy Statement that is applicable "at the time the court renders its decision[,]" not at the time the motion is filed. *Crawley*, 140 F.4th at 170.

The Policy Statement provides, in part, U.S.S.G. § 1B1.13(a):

> (a) IN GENERAL.—Upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—
>
> (1) (A) extraordinary and compelling reasons warrant the reduction; or
>
> (B) the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C.

§ 3559(c) for the offense or offenses for which the defendant is imprisoned;

(2) the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

(3) the reduction is consistent with this policy statement.

Section 1B1.13(b) of the Policy Statement is titled "EXTRAORDINARY AND COMPELLING REASONS." It states: "Extraordinary and Compelling reasons exist under any of the following circumstances or a combination thereof[.]" It then identifies multiple circumstances that, individually or in combination, may provide "extraordinary and compelling reasons" for a reduction in sentence. *See* § 1B1.13(b)(1)–(6). These include certain medical circumstances of the defendant, such as a terminal illness, "serious cognitive impairment," a medical condition that requires "specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death"; or the defendant is at imminent risk of being affected by "an ongoing outbreak of infectious disease" or "an ongoing public health emergency. . . .", § 1B1.13(b)(1)(A), (B), (C), (D); the defendant's age, along with other factors, § 1B1.13(b)(2); the defendant's family circumstances, § 1B1.13(b)(3)(A), (B), (C), (D); the defendant, while in custody, was the victim of sexual or physical abuse committed by, or at the direction of, a correctional officer, § 1B1.13(b)(4)(A), (B); and, for a defendant who received an "unusually long sentence" and has served at least 10 years of the sentence, a change in the law that "produce[s] a gross disparity" in relation to "the sentence likely to be imposed at the time the motion is filed. . . .", § 1B1.13(b)(6).

U.S.S.G. § 1B1.13(b)(5), a catchall provision, is titled "Other Reasons." It pertains to a defendant who "presents any other circumstance or combination of them that," when considered by themselves or together with any of the reasons described in paragraphs (1) through (4), are

similar in gravity to those described in paragraphs (1) through (4)."

In deciding whether a defendant has met the ten-year requirement in U.S.S.G. § 1B1.13(b)(6), the district court may only consider the time a defendant has served in prison, and cannot adjust that amount with good-time credits. *Crawley*, 140 F.4th at 172–73. But, as noted, under § 1B1.13(b)(5), the district court may consider "any other circumstance or combination of circumstances . . . similar in gravity to" the circumstances "described in paragraphs (1) through (4)." The capacious language in § 1B1.13(b)(5) underscores that the enumerated circumstances listed in the Policy Statement are not an "exhaustive list" of extraordinary or compelling reasons. *Johnson*, 143 F.4th at 216.

For example, in *Johnson*, the Court affirmed a district court's decision to reduce a defendant's sentence based on the disparity between the defendant's sentence and those of his co-conspirators. *Id.* at 215–16. But, in *Fernandez*, 146 S. Ct. at 1302, the Supreme Court made clear that "the supposed invalidity of a conviction is not among the 'extraordinary and compelling reasons' that justify compassionate release."

Section 1B1.13(c) of the Policy Statement is titled "LIMITATION ON CHANGES IN LAW." It specifies that, "[e]xcept as provided in subsection (b)(6)," which concerns an "unusually long sentence," "a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) shall not be considered for purposes of determining whether an extraordinary and compelling reason exists under this policy statement." U.S.S.G. § 1B1.13(c). It also states, *id.*: "However, if a defendant otherwise establishes that extraordinary and compelling reasons warrant a sentence reduction under [the Policy Statement], a change in the law (including an amendment to the Guidelines Manual that has not been made retroactive) may be considered for purposes of determining the extent of any such reduction." *See Davis*, 99 F.4th at 654.

Section 1B1.13(d) of the Policy Statement concerns rehabilitation of the defendant. It limits the weight a court may assign to a defendant's rehabilitation while serving a sentence. That section provides that, "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13(d). Further, the provision states, *id.*: "However, rehabilitation of the defendant while serving the sentence may be considered in combination with other circumstances in determining whether and to what extent a reduction in the defendant's term of imprisonment is warranted." And, § 1B1.13(e) provides that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction.

Even if a defendant establishes extraordinary and compelling reasons for relief, a reduced sentence does not necessarily follow. The court must then consider the sentencing factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon*, 560 U.S. at 826–27; *United States v. Washington* 161 F.4th 816, 821 (4th Cir. 2025); *Brown*, 78 F.4th at 128; *United States v. Mangarella*, 57 F.4th 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d at 397; *see also Kibble*, 992 F.3d at 329–30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693–94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors); *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly

make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion). Notably, the amendments to the Guidelines in November 2023 did not alter this requirement.

The § 3553(a) "factors include 'the nature and circumstances of the offense'; 'the history and characteristics of the defendant'; and the need for the sentence to 'provide just punishment,' 'afford adequate deterrence,' 'protect the public from further crimes of the defendant,' and 'provide the defendant with . . . training, medical care, or other correctional treatment.'" *Jenkins*, 22 F.4th at 170 (quoting 18 U.S.C. § 3553(a)).

Additionally, the court may consider the "'kinds of sentences available,' and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" *Burleigh*, 145 F.4th at 548 (quoting 18 U.S.C. § 3553(a)(1), (3), (6)). The Fourth Circuit has observed that "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *Jackson*, 952 F.3d at 500). And, district courts "enjoy the discretion to give additional weight to any one factor so long as they do not confine their analysis to that factor." *Davis*, 99 F.4th at 656; *see Washington*, 2025 WL 3559989 at *3; *United States v. Friend*, 2 F.4th 369, 381–82 (4th Cir. 2021). In weighing the § 3553(a) factors, the court may consider the terms of a plea bargain. *Bond*, 56 F.4th at 384–85.

In *Davis*, 99 F.4th at 659, the Fourth Circuit said: "District courts are not required to acknowledge and address each of the defendant's arguments on the record when conducting a § 3553(a) analysis." But, "'the record as a whole'" must demonstrate that the judge considered

the parties' contentions and had "'a reasoned basis'" for the exercise of judicial discretion. *Malone*, 57 F.4th at 176 (citations omitted); *see also Davis*, 99 F.4th at 659; *United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

In particular, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190). And, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law." *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167; *see also Brown*, 78 F.4th at 132 (criticizing district judge's "cursory" consideration of the § 3553(a) factors); *United States v. Dillard*, 891 F.3d 151, 158 (4th Cir. 2018). Moreover, the district court's "discretion is not boundless" and "in exceptional case[s]" the district court can abuse this discretion either by neglecting to "adequately explain how it weighed the § 3553(a) factors" or by "failing to recognize that the relevant § 3553(a) factors clearly favor release." *United States v. Smith*, 2025 WL 1864767, at *3, *4 (4th Cir. July 7, 2025) (unreported) (cleaned up) (finding that the district court abused its discretion by failing to acknowledge how the "multiplicity of factors combine to make the case for compassionate release").

"How much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see Washington*, 161 F.4th at 821; *Malone*, 57 F.4th at 170; *United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021). For example, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and

detailed explanation [is] required.'" *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).

In any event, as stated, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *Cohen*, 2022 WL 2314300, at *1 (quoting *High*, 997 F.3d at 190). It is "not difficult" for a district court to satisfy this standard. *Burleigh*, 145 F.4th 541, 550. However, a more detailed explanation may be required if a substantial change in the law creates a disparity between the sentence a defendant actually received and the sentence he would receive, if sentenced under current law. *See Davis*, 99 F.4th at 661; *see* 18 U.S.C. § 3553(a)(6) (directing a court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."); *see Moody*, 115 F.4th at 310 (recognizing that a defendant may not "challenge the validity of a sentence in a compassionate release" motion but explaining that a court may consider whether a defendant's sentence would be shorter "because of changes in law."). In explaining its compassionate release ruling, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors . . . ." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

*Davis*, 99 F.4th 647, is informative. The Court recognized that a change in the Guidelines or the law can produce a sentencing disparity under § 3553(a)(6). *Id.* at 654–55. And, the Court observed that changes in the law since the defendant's sentencing "would [have] lower[ed] [the defendant's] guidelines range from a 188–235 months range to [a] 92–115 months range." *Id.* at 661. According to the Court, if the defendant were sentenced under current Guidelines, "it is very likely that [the defendant] would already be out of prison." *Id.* The Court stated, *id.*: "That reality alone implicates one of the applicable sentencing factors: 'the need to avoid unwarranted sentence

disparities among defendants with similar records who have been found guilty of similar conduct.'" *Id.* (quoting 18 U.S.C. § 3553(a)(6)).

The Court concluded that the district court was obligated to provide a "detailed explanation" of its § 3553(a) analysis, because "[t]his sentence disparity is so stark, and the change in law so substantial." *Davis*, 99 F.4th at 661 (citing *Chavez-Meza v. United States*, 585 U.S. 109, 119 (2018)). Nevertheless, in *Burleigh,* 145 F.4th at 550, 551, the Court recognized that, even if a defendant's sentence "would be shorter if issued today," this fact does not "increase the burden on district courts to explain their decision."

**2. Extraordinary and Compelling Circumstances**[25]

Holness has asserted two circumstances that he contends constitute extraordinary and compelling grounds for compassionate release: (1) chronic medical conditions, coupled with the spread of COVID-19 in federal prisons, and (2) the length of his sentence. ECF 174 at 3. Neither ground has merit.

**a. COVID-19**

Holness filed his Motion not long after I denied his prior compassionate release motion. *See* ECF 160, ECF 168; ECF 170, ECF 171. In my prior Memorandum Opinion (ECF 170), I said: "[N]either Holness nor the government has submitted copies of defendant's medical records. In the absence of such evidence, it is impossible for the Court to ascertain the nature of defendant's underlying health conditions." *Id.* at 23. The government has now submitted defendant's medical records. ECF 190. Holness also submitted medical records. ECF 222-2.

[25] The government "does not contest" that Holness has exhausted his administrative remedies. ECF 188 at 17. Therefore, I decline to spill ink on the issue.

Defendant maintains that the Court should grant his Motion because his underlying health conditions render him particularly vulnerable to COVID-19 and thus create an extraordinary and compelling reason for his release. ECF 174 at 5. The defendant's medical records reveal that Holness suffers from the following conditions: G6PD deficiency;[26] anemia; sickle cell trait; hyperlipidemia; lower back pain from a herniated disc; and obesity. *See* ECF 190 at 3–4, 33. Holness also claims that he has elevated levels of protein in his kidneys and suffers from vertigo. ECF 216 at 2; ECF 222 at 1; ECF 222-2 at 1. In addition, Holness asserts that he suffers from the "persistent effects of long COVID." ECF 222 at 1.

In ECF 174, Holness avers that COVID-19 "jeopardize[s]" his life "while incarcerated[.]" *Id.* at 3; *see also id.* at 5 (claiming that "the COVID-19 virus has created a danger to [defendant's] health and well-being in a prison environment").[27] Holness summarizes the list of COVID-19 risk factors identified by the Centers for Disease Control ("CDC") as of 2021, as well as the impact of the Delta Variant on the number of reported cases, and the high rate of infection in prisons. *Id.* at 5–6. In another filing (ECF 192), Holness argues that the "government continue[s] to downplay" his "health conditions," and he draws the Court's attention to the Omicron variant of COVID-19. *Id.* at 10.

[26] G6PD deficiency is a genetic disorder. *G6PD (Glucose-6-Phosphate Dehydrogenase) Deficiency*, JOHNS HOPKINS MEDICINE, https://perma.cc/F3UY-HD3A (last accessed Nov. 25, 2025). G6PD is an enzyme "that helps red blood cells work correctly." *Id.* A deficiency of the GDPD enzyme can cause anemia because the individual's "red blood cells break down faster than they normally would." *Id.*

[27] In 2022, Holness's sister and a child wrote separately to this Court, claiming that Holness had become infected with COVID-19 three times. ECF 183 at 1; ECF 185 at 2. Holness has received three doses of the COVID-19 Moderna vaccine, including a "booster" shot on April 24, 2022. ECF 190 at 52, 65.

After Holness wrote to the Court to advise of his concerns regarding COVID-19 at FCI Allenwood (ECF 172), he was transferred to FCI Ray Brook. *See* ECF 188 at 17.[28] Then, as of January 30, 2024, Holness was transferred to FCI Otisville. ECF 205 at 11. And, as discussed, Holness is now incarcerated at FCI Berlin. Defendant's concerns in regard to the conditions at penal facilities where he was previously incarcerated are not a basis for relief.[29]

The government aptly argues that Holness's "fear of contracting COVID-19" does not qualify as an extraordinary and compelling reason for compassionate release. ECF 188 at 1. Moreover, the government contends: "Holness does not have any medical condition that places him at an increased risk of severe illness if he contracted COVID-19, and he is fully vaccinated against the virus." *Id.* at 1–2. For example, with respect to Holness's hyperlipidemia, the government claims that it is "not a risk factor for severe illness from COVID-19 under the CDC guidelines." *Id.* at 19. Further, the government notes that defendant is being "treated with medications, with no complications[.]" *Id.* at 20. As to Holness's obesity, the government states that "there is no indication from his medical records" that suggests that Holness's "weight places him in any increased risk", when "taken in conjunction with his vaccination status[.]" *Id.* It also

---

[28] As to the risk of COVID-19 at FCI Ray Brook, the government claimed that the "BOP has fully vaccinated 143 staff members and 617 inmates[.]" ECF 188 at 17. The government asserts that at the time of filing its opposition, FCI Ray Brook housed 915 inmates, and there were "no active cases of COVID-19 among inmates" at the facility. *Id.* But, defendant is no longer imprisoned at FCI Ray Brook.

[29] According to Holness, the conditions at FCI Ray Brook are "highly unsafe" and his treatment there "amounts to cruel and unusual punishment." ECF 192 at 13. For example, Holness claims the Court should not rely on the reported test results for FCI Ray Brook because the institution "encourage[s] inmates not [to] inform the medical staff" if they are infected. *Id.* at 11. He also contends that the prison does "not test for the virus" and does "not have adequate medical staff." *Id.; see* ECF 193 at 3 (describing FCI Ray Brook as "severely under staffed" without any "physician[s]" and "a very inadequate medical staff."); ECF 193-1 at 10 (Lohr Mckinstry, *Union: Ray Brook federal prison way understaffed*, PRESS-REPUBLICAN (Sept. 21, 2022)).

claims that "there is no indication that Holness's sickle cell trait diagnosis places him at increased risk of severe illness from COVID-19[.]" *Id.* at 20–21.

In addition, the government notes that Holness received the Moderna vaccine for COVID-19, which "precludes" him from being eligible for compassionate release. It cites numerous judicial decisions denying compassionate release to inmates who had been vaccinated against COVID-19. *Id.* at 21–26. The government also posits that "if vaccine-resistant variants emerge or the vaccines prove less efficacious than studies to date suggest . . . nothing would prevent the defendant from filing another motion for compassionate release." *Id.* at 26. But, in the government's view, "this Court's assessment should be driven by the prevailing scientific view that vaccination makes extremely rare, and possibly eliminates entirely, the risk of severe disease from the virus." *Id.*

I pause to provide context with regard to COVID-19, because memories sometimes fade. Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (accessed Oct. 19, 2023). On March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020). Two days later, on March 13, 2020, President Trump declared a national emergency. *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* TRUMP WHITE HOUSE (Mar. 13, 2020), https://perma.cc/WF55-8M4P. That declaration was extended on several occasions. *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

By May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

cases upended everyday life." Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023—the last day on which Johns Hopkins University updated its COVID-19 data—more than 103.8 million Americans had been infected with COVID-19. *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (accessed Oct. 16, 2023).

However, the urgency initially created by the COVID-19 pandemic has largely subsided. Indeed, there is currently no COVID-19 crisis. On April 10, 2023, President Joseph Biden, Jr. signed into law House Joint Resolution 7, "which terminate[d] the national emergency related to the COVID-19 pandemic." Pub. L. No. 118-3, 137 Stat. 6 (2023); *see* U.S.S.G. § 1B1.13(b)(1)(D)(i)(II) (contemplating an "ongoing public health emergency declared by the appropriate federal, state, or local authority . . ."). Thus, many of defendant's COVID-19 health concerns are essentially outdated.

As discussed, U.S.S.G. § 131.13 is titled "Reduction in Term of Imprisonment Under 18 U.S.C. § 3582(c)(1)(A) (Policy Statement)." U.S.S.G. § 1B1.13(b), titled "Extraordinary And Compelling Reasons," contains a variety of circumstances that constitute extraordinary and compelling reasons. Section 1B1.13(b)(1), titled "Medical Circumstances Of The Defendant," is pertinent.

U.S.S.G. § 1B1.13(b)(1)(D) concerns the outbreak of infectious diseases, such as COVID-19. It states that "[e]xtraordinary and compelling reasons exist" if:

> (D) The defendant presents the following circumstances—
>
> > (i) the defendant is housed at a correctional facility affected or at imminent risk of being affected by (I) an ongoing outbreak of infectious disease, or (II) an ongoing public health emergency declared by the appropriate federal, state, or local authority;

> (ii) due to personal health risk factors and custodial status, the defendant is at increased risk of suffering severe medical complications or death as a result of exposure to the ongoing outbreak of infectious disease or the ongoing public health emergency described in clause (i); and
>
> (iii) such risk cannot be adequately mitigated in a timely manner.

As of January 21, 2025, BOP data indicates that there were two COVID-19 cases among the 946 inmates at FCI Berlin, 416 of whom are fully inoculated against the virus.[30] *Inmate COVID-19 Data*, BUREAU OF PRISONS, https://perma.cc/YMX7-KMGN (2 total COVID-19 cases at the facility as of January 21, 2025). Based on the lack of COVID-19 cases at FCI Berlin, the facility is not currently "affected" by or at "imminent risk of being affected by" an "ongoing outbreak" of COVID-19. U.S.S.G. § 1B1.13(b)(1)(D)(i); *see United States v. Deleon*, LKG-16-267, 2024 WL 4555724, at *9 (D. Md. Oct. 23, 2024) (no extraordinary and compelling ground for compassionate release where "the Petitioner is at no greater risk from Covid-19 than other . . . members of the general public who have similar underlying health conditions."); *United States v. Rice*, JKB-04-0323, 2022 WL 3083459, at *2 (D. Md. Aug. 3, 2022) (finding that although obesity and mild hypertension and other risk factors "may have been sufficient to establish an extraordinary and compelling reason at the outset of the pandemic, the Court concludes that they are insufficient to do so now"). It is also noteworthy that defendant has received several rounds of the Moderna vaccine for COVID-19. *See* ECF 190 at 52, 65; *see also United States v. Baeza-Vargas,* 2021 WL 1250349, at *3–4 (D. Ariz. Apr. 5, 2021) (collecting cases showing the "growing

[30] I cite to the COVID-19 data with respect to FCI Berlin because that is defendant's current location. *See Bureau of Prisons Inmate Locator*, https://www.bop.gov/inmateloc/ (search by BOP Register Number 44514-037) (last accessed June 8, 2026).

consensus" of district courts denying compassionate release when an inmate is vaccinated against COVID-19).

It follows that defendant has not established an extraordinary and compelling circumstance for compassionate release grounded in COVID-19.

That said, defendant does have some health issues. Defendant's medical records date from August 20, 2021, to May 29, 2025. ECF 190 at 1, 64; ECF 222-2 at 1. As noted, Holness has a history of G6PD deficiency that has led to anemia; sickle cell trait; and hyperlipidemia. ECF 190 at 3–4; ECF 222-2 at 1. Holness's medical records also indicate that he is overweight. ECF 190 at 33, 35. As of March 29, 2025, Holness weighed 198 pounds, and stood at five feet and six inches. ECF 222-2 at 4. This places Holness's BMI at 32, which constitutes obesity. *Calculate your BMI*, NATIONAL HEART, LUNG, AND BLOOD INSTITUTE, https://perma.cc/X7JZ-NCYC (last accessed July 6, 2026).

U.S.S.G. §§ 1B1.13(b)(1)(B) and (C) provide:

> (b) EXTRAORDINARY AND COMPELLING REASONS.—Extraordinary and compelling reasons exist under any of the following circumstances or a combination thereof:
>
> (1) MEDICAL CIRCUMSTANCES OF THE DEFENDANT.—
>
> * * *
>
> (B) The defendant is—
>
> (i) suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.
>
> * * *
>
> (C) The defendant is suffering from a medical condition that requires long-term or specialized medical care that is not being provided and without which the defendant is at risk of serious deterioration in health or death.

There is no evidence that defendant's medical conditions impede his ability to provide self-care. And, defendant's medical records show that his medical conditions have been effectively managed by the BOP. *See, e.g.,* ECF 190 at 14 (describing how Holness is "taking his medication [to address his hyperlipidemia] and trying to watch his diet" and "denies any other issues" with respect to this condition; noting that as to his "sickle cell trait", Holness "denies any issues at this time"); *id.* at 17 (renewing medication orders for Holness for Atorvastatin to treat Hyperlipidemia; Fluocinonide to treat eczema; and nasal spray[31] to treat Holness's allergic rhinitis [hay fever]); *id.* at 28–29 (prescribing Holness Atorvastatin to treat Hyperlipidemia and Fluocinonide to treat eczema); *id.* at 54 (listing Holness's prescribed medications, including Atorvastatin, Fluocinonide cream, and two nasal sprays); ECF 222-2 at 5 ("Patient . . . has Hyperlipidemia, which is being treated by a statin, which is controlling this condition[.]").

With regard to Holness's sickle cell trait, two evaluations of Holness's condition were conducted in March and February of 2022. ECF 190 at 31–32. Both evaluations indicate that Holness has never had a "sickle cell crisis[.]" *Id.*

In short, there is nothing in defendant's medical records to suggest that his health conditions place him at undue risk if he remains incarcerated, whether by themselves or because of COVID-19. His conditions do not affect his self-care, and "he cannot point to a *current* deficiency in his care." *Callaham,* 2026 WL 2169113, at *1 (emphasis in original). Therefore, defendant has not satisfied U.S.S.G. § 1B1.13(b)(1)(B)(i) or § 1B1.13(b)(1)(C).

[31] The medical evaluation prescribes "Triamcinolone AQ Nasal Aerosol Soln 55[.]" ECF 190 at 17. This is a nasal spray "used to relieve symptom of allergic rhinitis, such as sneezing, runny nose, and nasal congestion." *Triamcinolone Nasal Spray: Dosage, Uses, and Side Effects Guide*, THE KINGSLEY CLINIC, https://perma.cc/GLQ8-2NM8 (last accessed Nov. 25, 2025).

Moreover, to the extent that defendant's health conditions would place defendant at an increased risk of severe illness from COVID-19 if an outbreak were to occur, I decline to find extraordinary and compelling circumstances at the present time. COVID-19 simply is not a current health threat. If this were to change, defendant could renew his motion on that basis.

In sum, on this record, defendant has not established an extraordinary and compelling reason for compassionate release based on his health conditions or due to COVID-19. However, the Court recognizes that the defendant's medical records are not current, through no fault of the defendant. Therefore, my conclusion is made without prejudice to defendant's right to seek reconsideration based, *inter alia*, on a change in defendant's medical condition or a claim of inadequate medical care.

**b. Unusually Long Sentence**

Holness complains that he "was given an unusually long sentence for his crime[.]" ECF 174 at 3; *see* ECF 205 at 2. On this basis, he asks the Court to reduce his life sentence, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). *See, e.g.,* ECF 192 at 14; ECF 193 at 3; ECF 205 at 1–2.

Defendant reiterates arguments that he made in his first motion for compassionate release, in which he claimed his sentence "was a product of misinterpretation of the law and under today's sentencing scheme, the Court would not have authority to give him such a long and harsh sentence." ECF 166 at 4; *see* ECF 174 at 8 (same). Specifically, he contends that, "[i]f sentenced today," he "would not face a statutory mandatory minimum sentence of life." ECF 174 at 11.

Count One charged defendant with interstate domestic violence under 18 U.S.C. § 2261(a)(1), and it carries a maximum sentence of life in prison. The statute governing attempted witness intimidation (Count Three), 18 U.S.C. § 1512(b)(1), carries a maximum sentence of 20 years. The penalties associated with these crimes have not changed since Holness was sentenced

in 2011. *See* ECF 169, ¶¶ 59, 60. Therefore, at the time of sentencing, defendant did not face a mandatory minimum sentence, under either 18 U.S.C. § 2261(b)(1) or § 1512(b)(1), the two offenses for which Holness was sentenced. *See* ECF 103; ECF 169, ¶¶ 59, 60. It follows that this contention is without merit.

Holness also claims that "the Judge and not the jury . . . found that 18 U.S.C. 1111 applied in this case." *Id.* However, Holness was not convicted under 18 U.S.C. § 1111. This argument is unavailing. *See* ECF 103.

In his Motion, Holness also challenges the prosecution itself, including the validity of his conviction. For example, Holness claims that his "conviction and sentence was a product of a sham prosecution[.]" ECF 192 at 6. He adds that "the statute under which" he "was indicted was unconstitutionally applied to him, because" his marriage to Dunkley was "a sham marriage[.]" *Id.*; *see* ECF 193 at 3 ("[T]he statute under which [defendant] was tried and convicted were improperly and unconstitutionally applied to him, and no reasonable jury would've found him guilty, knowing that the victim was not his spouse or dating partner."); *see also* ECF 205 at 3. Elsewhere, he asserts "prosecutorial misconduct," ECF 231 at 2, and accuses the government of lying about the reason for its interest in the case. *Id.* at 3.

As indicated, a motion for compassionate release is not the proper vehicle to challenge the validity of a defendant's conviction or sentence. *Fernandez*, 146 S. Ct. at 1304-05; *United States v. Smith*, 2024 WL 3042894, at *1 (4th Cir. June 18, 2024) (per curiam). Moreover, Holness does not identify any intervening change in the law that would render his sentence unusually long.

The government correctly observes that, "if sentenced today, Holness would still face a guidelines range of life imprisonment." ECF 188 at 28. The base offense level associated with 18 U.S.C. § 2261 is 18. *See* U.S.S.G. § 2A6.2. But, because the victim was killed, pursuant to

U.S.S.G. § 2A6.2(c)(1), the offense level is cross referenced to U.S.S.G. § 2A1.1, *i.e.*, first degree murder. The base offense level for first degree murder is 43. *Id.* Defendant never accepted responsibility, so there were no deductions on that basis. With an offense level of 43, and a criminal history category of I, the Guidelines currently call for a sentence of life imprisonment, just as they did in 2011, when Holness was sentenced. *See* ECF 169, ¶ 61; *Sentencing Table,* U.S. SENT'G COMM'N, https://perma.cc/C5JH-JFAY (last accessed Aug. 13, 2026).

Nevertheless, defendant maintains that, if sentenced today, he likely would not receive a life sentence. He identifies other defendants whose sentences for allegedly comparable crimes are shorter than his sentence. ECF 174 at 8–9; ECF 192 at 9–10. Holness posits: "Defendants convicted post-2018 under § 2261(a)(1) without first-degree findings typically receive 20-30 years, not life." ECF 232 at 2. He does not indicate whether those sentences were imposed for defendants who went to trial and never expressed remorse. In any event, defendants convicted of murder do not "typically" receive sentences of twenty years. And, as discussed below, many receive lengthy sentences. Nevertheless, defendant contends that the current sentencing disparity is a basis for compassionate release.

Defendant's submissions predate the decisions of the Supreme Court in *Fernandez* and *Rutherford*, discussed earlier. *Rutherford*, as indicated, concerned an actual change in the law. There, it was irrefutable that, if the defendants in that case were sentenced today, they would not have been subject to the same mandatory minimum sentences previously required by statute. However, Congress did not make that change in the law retroactive. Despite the undisputed disparities between the sentences imposed on the defendants in *Rutherford* and the reduced sentences they would face under current law, the Supreme Court rejected the claim that the

significant sentencing disparities amounted to an extraordinary and compelling reason for compassionate release.

That said, in recent years, some federal judges have been lenient in sentencing in murder cases. In dicta in *United States v. Smith*, 827 F. Supp. 3d 614, 619 (D. Md. 2026), the court said: "[T]oday, an 80-year sentence is grossly disproportionate to sentences being imposed for even murder offenses."[32] *See also*, *e.g.*, *United States v. Bryant*, CCB-95-202, 2020 WL 2085471, at *5 n.8 (D. Md. Apr. 30, 2020) ("According to statistics released by the United States Sentencing Commission for fiscal year 2018, the national average sentence for murder was 291 months, and the Fourth Circuit average was 327 months.") (citing *United States v. Redd*, 444 F. Supp. 3d 717, 728 (E.D. Va. 2020)). But, many factors may account for leniency, such as plea bargains favorable to defendants who accept responsibility and modification of sentences for elderly defendants.

Moreover, there are still many cases where a harsh hand is dealt. Several cases in this District and elsewhere suggest that while some courts may be lenient, others are not.

In any event, even if sentencing attitudes have evolved, *Rutherford* compels this Court to reject defendant's contention that a change in the sentencing landscape is a valid basis for compassionate release. If an actual, non-retroactive change in the law does not amount to an extraordinary and compelling reason for compassionate release, as in *Rutherford*, surely a change in sentencing attitudes, with the mere possibility of a lenient sentence, does not constitute a ground for such relief.

To frame defendant's contention that leniency now predominates, I shall first review the mean and median sentences imposed for murder nationally and in the Fourth Circuit in 2023, 2024,

[32] The *Smith* case involved a defendant who received an 80-year sentence for firebombing the home of a community activist. However, the target in that case was not injured.

and 2025, as documented by the U.S. Sentencing Commission. A median sentence does not signify that all murder sentences are that length, however. Instead, it charts the middle value of a distribution of sentences. By its terms, it connotes that half the sentences are higher and half are lower. The mean reflects the sum divided by the total number of sentences. It is essentially an average.

Of course, it is not possible to determine the precise number of years for a life sentence, given the fact that length of life varies with each defendant. So, sentences of 470 months or more, including life sentences, are reflected in the Commission's computations as sentences of 470 months, creating a ceiling for the sentence average that may be artificially reduced.[33] Moreover, the computations do not reflect the differences, if any, for sentences of defendants who plead guilty versus sentences for those defendants who proceed to trial. *See Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2025, District of Maryland*, U.S. SENT'G COMM'N, https://perma.cc/UBA6-337E.

Beginning with the year 2023, the mean and median for national sentences imposed for murder were 285 and 276 months, respectively. *Table 15, "Sentence Imposed by Type of Crime,"* at 40, in *2023 Annual Report and Sourcebook of Federal Sentencing Statistics*, U.S. SENT'G COMM'N, https://perma.cc/4JQA-G7K7. Looking at sentences in the Fourth Circuit in 2023, the mean and median sentences imposed for murder were 295 months and 292 months, respectively. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2023, Fourth Circuit*, U.S. SENT'G COMM'N, https://perma.cc/8GZU-HYTV.

---

[33] A twenty year old defendant who receives a life sentence might live far longer than 470 months, *i.e.*, 39 years.

In 2024, the respective mean and median sentences nationally for murder were 274 and 240 months. *Table 15, "Sentence Imposed by Type of Crime,"* at 38, in *2024 Annual Report and Sourcebook of Federal Sentencing Statistics*, U.S. SENT'G COMM'N, https://perma.cc/J6ST-XCZA. For that same year, in the Fourth Circuit, the mean and median sentences for murder were 273 and 300 months. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2024, Fourth Circuit, U.S. SENT'G COMM'N*, U.S. SENT'G COMM'N, https://perma.cc/F267-5LA9.

For 2025, the mean and median national sentences imposed for murder were 286 and 292 months. *Table 15, "Sentence Imposed by Type of Crime,"* at 38, in *2025 Annual Report and Sourcebook of Federal Sentencing Statistics*, U.S. SENT'G COMM'N, https://perma.cc/WEP9-X9L3. In 2025, the Fourth Circuit mean and median sentences for murder were 292 and 288 months. *Table 7, "Sentence Length by Type of Crime,"* at 11, in *Statistical Information Packet, Fiscal Year 2025, Fourth Circuit, U.S. SENT'G COMM'N*, U.S. SENT'G COMM'N, https://perma.cc/M678-V2NW.

Defendant's life sentence exceeds the current national mean and median sentences for murder. But, "trends alone cannot justify a sentence reduction." *Brothers v. United States*, RAJ-11-58, 2026 WL 1558250, at *3 (E.D. Va. June 2, 2026); *see United States v. Locust*, 771 F. Supp. 3d 819, 830 (E.D. Va. 2025) (observing that although "[l]ife sentences may be less common today than when Defendant was sentenced . . . . the court must balance these aggregated statistics against the obligation to analyze a defendant's individual circumstances when contemplating a sentence reduction.").

As indicated, the averages do not distinguish between sentencing ranges for those who plead guilty and thus accept responsibility, as compared to those who proceed to trial. Of course,

a defendant has a constitutional right to deny the charges and to put the government to its burden of proof at a trial. A defendant cannot be punished for exercising that right. But, a defendant who pleads guilty and accepts responsibility is rewarded with deductions to an offense level. Indeed, "some disparity" between the sentences meted out for defendants who plead guilty and those who go to trial is warranted because, by pleading guilty, a defendant "spare[s] the Government the expense of their own trial[.]" *United States v. Countess,* BAH-04-00232, 2026 WL 482312, at *3 (D. Md. Feb. 20, 2026). Moreover, a court may find a defendant's remorse a basis for leniency.

Next, I shall review a handful of cases, mostly from this District, generally as to murder. But, I begin with a robbery case. In *United States v. Myers*, CCB-01-188, 2021 WL 2401237, at *3 (D. Md. June 11, 2021), the defendant was serving a sentence of 294 months for multiple robberies committed in the late 1990's. *Id.* at *1. In regard to the defendant's motion for compassionate release, Judge Blake recognized a change in the law since the defendant's sentencing, stating that "the guideline sentence imposed [was] no longer mandatory, and . . . it [was] doubtful whether Myers would still qualify as a career offender . . . ." *Id.* at *3 (internal citations omitted). As noted, in this case, there is no change in the law.

In evaluating a motion for sentence reduction based on a change in the law that created a sentencing disparity, Judge Blake identified factors a court should consider: (1) whether the sentence imposed is grossly disproportionate to a sentence the defendant would likely receive if sentenced today, signifying that the sentence is "dramatically longer than necessary or fair;" (2) whether the sentence imposed is unusually or grossly lengthy in comparison to sentences currently imposed for similar or more serious offenses; (3) the length of the sentence the defendant already has served; and (4) other personal characteristics of the defendant, which may include the defendant's relative youth at the time of the offense and post-sentencing conduct. *Id.*

In light of *Rutherford*, the extent to which these factors remain pertinent is not clear. Yet, even with the change in the law that was at issue in *Myers*, Judge Blake concluded that the sentence at issue was "not dramatically different from the range [the defendant] would likely face today." *Id.* Therefore, she denied the defendant's motion. *Id.* at *4.

*United States v. Kearney*, 837 F. App'x 975 (4th Cir. 2020), a fairly recent case that is factually similar to this case, suggests that defendant's sentence is not actually disparate. In *Kearney*, the defendant, who was in the Army, lived apart from his wife. In August 2015, he drove from South Carolina to Maryland, where he shot and killed his wife. *Id.* at 977. The defendant and his mistress hatched the plot to murder the defendant's wife, and both were subsequently indicted. *Id.* The defendant was charged with interstate travel to commit domestic violence resulting in death, in violation of 18 U.S.C. § 2261(a)(1), and discharge of a firearm in relation to a crime of violence, resulting in death, in violation of 18 U.S.C.§ 924(c) and (j). *Id.*

The mistress pleaded guilty. *Id.* But, the defendant went to trial, and the jury found him guilty of both charges. *Id.* at 977–78. In November 2018, Judge Russell sentenced the defendant to life in prison as to count one and to a consecutive term of 120 months as to count two, for a total term of life plus ten years. *Id.* at 978; *see United States v. Kearney*, GLR-16-00486, ECF 161, ECF 162 (Judgment). The judgment was affirmed by the Fourth Circuit. *Id.* at ECF 208, ECF 209; *see Kearney*, 837 F. App'x at 978; *see also United States v. Kearney*, 2024 WL 446417 (4th Cir. Feb. 6, 2024) (per curiam) (dismissing appeal of denial of post-conviction petition under 28 U.S.C. § 2255).

In *Bailey v. United States*, JTC-16-06190, 2019 WL 4058599 (S.D.W. Va. Aug. 28, 2019), a jury convicted defendant in 1995 of kidnapping, in violation of 18 U.S.C. § 1201(a)(1), and interstate domestic violence, in violation of 18 U.S.C. § 2261(a)(2). *Id.* at *1. The defendant, in

a drunken blackout, assaulted his wife in their home and subsequently drove her in and out of West Virginia for a five-day period before taking her to a hospital in Kentucky. *United States v. Bailey*, 112 F.3d 758, 761 (4th Cir. 1997). Defendant's wife suffered serious and permanent injuries, and is in a vegetative state. *Id.* at 762–63.

The district court sentenced defendant to life in prison for the kidnapping count and twenty years, concurrent, for the interstate domestic violence count. *Bailey*, 2019 WL 405899 at *2. Notably, the court departed upward from the Guidelines range, pursuant to § 5K2.2 of the Guidelines. The Fourth Circuit affirmed. *Bailey*, 112 F.3d 758.

Thereafter, based on the Supreme Court's decision in *Sessions v. Dimaya*, 584 U.S. 148 (2018), the defendant sought to vacate his conviction for interstate domestic violence, arguing that the "crime of violence" definition provided to the jury was unconstitutionally vague. *Bailey,* 2019 WL 4058599, at *2. In 2019, the District Court for West Virginia vacated the defendant's conviction, pursuant to 28 U.S.C. § 2255. *Id.* at *5. Nevertheless, in light of the defendant's "intentional [and] brutish conduct" that led to his wife's permanent and life-threatening injuries, the court declined to reduce the defendant's life sentence for kidnapping. *Id.* at *6.

In *United States v. Byers*, 649 F.3d 197 (4th Cir. 2011), defendants Byers and Goodman were convicted at trial in a case involving the murder-for-hire of a witness in a drug case. *Id.* In 2009, both defendants received life sentences. *Id.* at 206. A third defendant, the triggerman, was fifteen at the time of the murder. *Id.* at 204 n.3. He entered into a plea agreement that provided for a 40-year sentence. *Id.* The Fourth Circuit affirmed. *Byers,* 649 F.3d at 217.

In *Countess*, 2026 WL 482312, the defendant was part of a murder for hire conspiracy. *Id.* at *1. At age twenty-five, Countess and a co-defendant "shot and killed" the victim "and later collected payment for their crime." *Id.* at *1. Countess went to trial in 2006 and was convicted of

the six charged offenses, including possession of a firearm in furtherance of a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). *Id.* The court sentenced the defendant to concurrent terms of life imprisonment for four counts, and concurrent terms of 240 months and 120 months, respectively, for the other two counts. *Id.* One of Countess's codefendants also went to trial, was convicted, and was sentenced to multiple life sentences. *Id.* But, two codefendants "accepted plea bargains and were sentenced to significantly shorter terms of imprisonment." *Id.*[34]

In December 2024, the codefendant, who had received a life sentence, "successfully petitioned to have his sentence reduced to thirty-five (35) years by Judge Blake." *Id.*; *see United States v. Thomas,* CCB-04-232, 2024 WL 5239411 (D. Md. Dec. 27, 2024) (granting motion of Countess's codefendant for compassionate release).

Countess also sought compassionate release. *Countess,* 2026 WL 482312, at *1. In evaluating his motion, Judge Hurson observed: "The median sentence for murder in this District is 300 months, and the national average is even lower." *Id.* at *4. Judge Hurson also noted that a "mandatory life sentence, however imposed, constitutes a significant sentencing disparity when considering how the modern criminal justice process operates on defendants like Countess." *Id.* (quotation marks and citation omitted).

Judge Hurson noted the disparity between the sentence Countess was serving and that of his codefendants. *Id.* at *5. He also found that "the difficult upbringing Countess endured and his relatively young age at the time of [the victim's] murder also support a finding of extraordinary and compelling reasons supporting a reduced sentence." *Id.* In addition, he noted that Countess had "taken significant steps to rehabilitate himself while in custody." *Id.* In light of these factors,

---

[34] In particular, one codefendant received a sentence of 77 months of imprisonment, while another was sentenced to 64 months. *Countess,* 2026 WL 482312, at *3. Neither one actually killed the victim, but both participated in the conspiracy. *Id.*

Judge Hurson reduced Countess's life sentence to 35 years of incarceration, consistent with the reduction that Judge Blake previously granted to a codefendant. *Id.* at *6.

*United States v. Hall*, RDB-02-00030, 2026 WL 1782056 (D. Md. June 22, 2026), is also noteworthy. There, the defendant was sentenced in 2002 to "three concurrent life sentences after pleading guilty to three counts of carjacking resulting in death[.]" *Id.* at *1. In particular, Hall "committed a carjacking of an unlicensed cab driver, Matthew Kenney, in which he ordered Mr. Kenney, at gunpoint, to drive into a wooded area. Once there, Mr. Hall killed Mr. Kenney and took his car." *Id.* Nine days later, defendant "committed the same crime against two other unlicensed cab drivers[.]" *Id.*

In 2023, Hall moved for compassionate release. *Id.* Judge Bennett determined that Hall was "not entitled to a sentence reduction[.]" *Id.* at *3. In particular, Judge Bennett observed that Hall's crimes were "extremely serious . . . committed in cold blood" and "the need to provide deterrence and just punishment, and the need to provide restitution to the victims all counsel against relief." *Id.* Additionally, the court concluded that "Mr. Hall has presented no post-sentencing mitigation evidence that would support a reduction in sentence[.]" *Id.*

*United States v. Johnson*, LKG-16-267, is also informative. The case involved several murders. In 2018, the court sentenced the shooter to thirty years of imprisonment, pursuant to a plea agreement entered under Fed. R. Crim. P. 11(c)(1)(C). *See id.*, ECF 897 (Plea Agreement), ¶¶ 9, 10; ECF 953 (Judgment). The defendant later sought compassionate release. *Id.,* ECF 1819. By Memorandum Opinion and Order of July 24, 2025, Judge Griggsby denied defendant's motion, finding, *inter alia*, that he had not identified an extraordinary and compelling reason for compassionate release. *Id.*, 2025 WL 2085018, at *5 (D. Md. July 24, 2025). She concluded that the sentence fell within the range of comparable sentences in the Fourth Circuit, given "that

approximately 44% of those sentenced under those parameters received a sentence of 30 years or more . . . ." *Id*. at *7 (citing an exhibit submitted by the government labeled "Sentencing Data").

Of import, Judge Griggsby noted that 32.8% of defendants receive "a sentence of life in prison." In other words, approximately one-third of defendants who commit murder receive a life sentence. Moreover, unlike in this case, the defendant in *Johnson* pleaded guilty, sparing the court, the witnesses, and the government the burdens of a trial.

In *United States v. Antoine*, PWG-19-140, the defendant was involved in a drug trafficking organization in Baltimore and confessed to the shooting and killing of an individual in relation to a drug conspiracy. *See id.*, ECF 349 at 9-10. He pleaded guilty to one count of conspiracy to distribute controlled substances and one count of discharging a firearm resulting in death during and in relation to a drug trafficking crime. *Id.* Although Antoine was the shooter, Judge Grimm imposed a total sentence in March 2021 of 270 months (22.5 years). *Id.*, ECF 465. But, unlike the defendant, Antoine pleaded guilty.

The case of *United States v. Plunkett*, MFU-04-70083, 2024 WL 4173806 (W.D. Va. Sept. 12, 2024), *appeal dismissed,* 2025 WL 2237443 (4th Cir. Aug. 6, 2025), provides another useful example. There, the defendant was accused of hiring two people to kill an individual the defendant believed was a confidential informant for local drug investigators. *Id.* One of defendant's coconspirators shot and killed the victim. *Id.*

In February 2005, Plunkett was charged in a five-count indictment, including changes of interstate stalking, in violation of 18 U.S.C. § 2261(A)(1), and use of a firearm during and in relation to a crime of violence resulting in death, in violation of 18 U.S.C. § 924(j). *Plunkett*, 2024 WL 4173806, at *1. Plunkett received concurrent life sentences for four counts, including life

sentences for his convictions under 18 U.S.C. § 2261(A)(1) and § 924(j). *Id.* at *2. His convictions and sentences were affirmed by the Fourth Circuit. *Id.*

Subsequently, Plunkett moved to vacate his convictions and sentences under 28 U.S.C. § 2255. *Id.* at *3, 8. In light of the Supreme Court's decision in *United States v. Davis*, 588 U.S. 445 (2019), the court vacated Plunkett's § 924(j) conviction. *Plunkett*, 2024 WL 4173806, at *5. Turning to the appropriate remedy, the court considered the "particular circumstances of" the case, "including the fact that two undisturbed counts of conviction carry a mandatory minimum penalty of life imprisonment," and concluded that it would not reduce Plunkett's life sentence. *Id.* at *10. Rather, the court left unchanged the other convictions and sentences, including the life sentence under 18 U.S.C. § 2261(A)(1).

In *United States v. Floyd*, CCB-16-597, Floyd was one of several defendants convicted in 2018 after a 25-day trial. *See id.*, ECF 477; ECF 491. In particular, he was convicted of racketeering conspiracy that included murders and drug conspiracy. However, Floyd was not the shooter. Although the defendant's offense level and criminal history category called for a life sentence, Judge Blake imposed a total sentence of 360 months of imprisonment, *i.e.*, 30 years. *Id.*, ECF 691 (Judgment).

*United States v. Warren, et al.*, JKB-22-439, is a multi-defendant case, Warren was a member of a gang that engaged in "a pattern of racketeering activity that included conspiracy to distribute controlled substances, possession with intent to distribute controlled substances, robbery and murder." *See id.*, ECF 271-1 at 1. Pursuant to a plea agreement (*id.*, ECF 271), Warren pleaded guilty to one count of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d). *Id.*, ¶ 1. The pattern of racketeering activity included a conspiracy that involved the attempt to murder five individuals. *Id.,* ECF 271-1 at 2. The plea was not entered under Fed. R. Crim. P. 11(c)(1)(C).

Nevertheless, the parties agreed to a sentence of 396 months of imprisonment as the appropriate disposition of the case. *See id.* ¶ 10.

At sentencing in 2024, the defendant was thirty-two years old. *Id.*, ECF 290 (PSR), at 3. Despite the parties' joint recommendation for a sentence of 396 months, Judge Bredar sentenced the defendant to a term of 467 months of imprisonment, *i.e.*, thirty-eight years and eleven months. *Id.*, ECF 292 (Judgment).

*United States v. Barron*, JKB-23-301, is also a multi-defendant case. Jerritt Barron, Jeremy Matheny, Antonio Purisima, and Nefertiti Moore were indicted in August 2023, for crimes stemming from a series of armed carjackings that took place during an eight-day period in June 2022. ECF 1. One of the carjackings culminated in murder. Barron, Matheny, Purisima, and Moore all pleaded guilty to one count of carjacking resulting in death, in violation of 18 U.S.C. § 2119(3). *Id.*, ECF 122 (Barron Plea Agreement) at 1; *id.,* ECF 126 (Matheny Plea Agreement) at 1; *id.,* ECF 134 (Purisima Plea Agreement) at 1; ECF 196 (Moore Plea Agreement) at 1.

In the Barron Plea Agreement, the defendant stipulated that he and his co-conspirators committed four armed carjackings and attempted to commit two more in June 2022. *Id*., ECF 122 at 10–11. Barron also stipulated "that he and/or his co-defendants possessed and brandished firearms during and in relation to the carjackings[.]" *Id.* In particular, Barron stipulated that he, Matheny, Purisima, and Moore stopped the murder victim's vehicle from entering a ramp to an interstate; Barron and Purisima approached the victim's car; and the "victim was then shot and died from the injuries." *Id.* at 10. Matheney "remained in the defendants' vehicle." *Id.*

After the murder, the group, without Purisima, committed three more armed carjackings and attempted a fourth, during which one of the defendants discharged a firearm. *Id.,* ECF 122 at 11. None of the plea agreements identifies the person who pulled the trigger. *See id.*; ECF 126 at

10; ECF 134 at 10. But, at Matheny's sentencing, both the government and Matheny's counsel acknowledged that Matheny "is not an individual that is accused in any of the incidents of being a trigger-puller." *Id.*, ECF 177 (Sentencing Transcript), at 16; *see id.* at 10.

Pursuant to the Barron Plea Agreement, the parties jointly recommended a sentence of 420 months for him, concurrent with sentences imposed by a Maryland court. *Id.* at 6.[35] Pursuant to the Matheny Plea Agreement, the parties jointly recommended a sentence of 264 months of imprisonment for him. *Id.,* ECF 126 at 6. Pursuant to the Purisima Plea Agreement, the parties jointly recommended a sentence of 360 months incarceration for him. *Id.,* ECF 134 at 6. Under the Moore Plea Agreement, the parties did not agree to a particular term of imprisonment. *Id.*, ECF 196.

Judge Bredar sentenced Barron and Matheny on May 28, 2026. *Id.,* ECF 153; ECF 154. Barron was twenty years of age when the carjackings took place and twenty-four years old at sentencing. *See id.,* ECF 141 at 2. Matheny was between the ages of twenty-three and twenty-four when the carjackings occurred and twenty-seven at the time of sentencing. *Id.,* ECF 143. Judge Bredar sentenced Matheny to 288 months of incarceration. *Id.,* ECF 155 at 2. Barron was sentenced to 480 months, concurrent with three Maryland State sentences. *Id.,* ECF 157 at 2.

[35] The government explained that it agreed to a greater sentence for Barron than Matheny because its "investigation revealed that [Barron] was the leader of the group and the organizer[.]" *Barron*, ECF 177 at 13.

At Matheny's sentencing, the government claimed that it did not "have any evidence to suggest that Matheny knew that Barron or Purisima were going to pull the trigger and kill the victim on the night of the murder." *Id.* at 9. The government noted that Matheny's "role in the carjacking, particularly the murder, was just lesser than of course Barron and Purisima[.]" *Id.* at 10. The government described Matheny as "the getaway driver" in the carjacking that resulted in murder. *Id.* at 11.

At sentencing in July 2026, Purisima was twenty-six years of age. *Id.,* ECF 190; *see also* ECF 162 (Purisima PSR), at 2. But, he was only twenty-one years of age when the carjackings took place. Judge Bredar sentenced Purisima to a term of 420 months of incarceration, concurrent with another Maryland State sentence. *Id.,* ECF 191 at 2.[36]

The sentence of thirty years that Holness's accomplice received for his role in the murder is also pertinent. Unlike defendant, Campbell pleaded guilty, pursuant to a plea agreement. *See United States v. Campbell,* MJM-14-0058, ECF 27. The plea was entered under Fed. R. Crim. P. 11(c)(1)(C), by which the parties agreed to a sentence of 360 months (30 years). *Id.* Notably, that term corresponded to the bottom of Campbell's Guidelines. Of course, Campbell's Guidelines were more favorable than those for Holness because Campbell accepted responsibility for his conduct. And, "similarly situated defendants who go to trial typically receive longer sentences than those who plead guilty." *United States v. Batts*, 251 F. App'x 197, 201 (4th Cir. 2007) (per curiam).

Holness exercised his right to go to trial. And, "some disparity is justified" between sentences provided to defendants who plead guilty and those who go to trial, "given that" defendants who plead guilty have "spared the Government the expense of their own trial[.]" *Countess*, 2026 WL 482312, at *4. As the Fourth Circuit said in *United States v. Sutton,* 126 F.4th 869, 881 (4th Cir. 2025), *cert. denied*, 145 S. Ct. 2764 (2025): "We would generally expect defendants who plead guilty and cooperate to receive lower sentences than their counterparts who go to trial." *See also United States v. Fernandez*, 104 F.4th 420, 428 (2d Cir. 2024) ("[O]ur system of pleas often results in individuals who accept a plea bargain receiving shorter sentences than

---

[36] Purisima has noted an appeal to the Fourth Circuit. *Id.,* ECF 199.

other individuals who are less morally culpable but take a chance and go to trial. And lower sentences for cooperating defendants are explicitly contemplated by the sentencing statute and the Sentencing Guidelines. Such practices are hardly most unusual, far from common, or with little or no precedent.") (cleaned up and citations omitted), *aff'd*, 146 S. Ct. 1292 (2026).

In the current federal sentencing climate, "the average sentence for murder is significantly shorter than [a life] sentence." *Thomas,* 2024 WL 5239411, at *1–2 (reducing a life sentence to thirty-five years in a murder-for-hire case where the defendant was the triggerman). In other words, some federal judges, in their discretion, have chosen not to impose sentences of life imprisonment in murder cases, or have reduced such sentences that were imposed years ago. *See*, *e.g.*, *United States v. Kirkland*, ELH-94-010, 2024 WL 4529303, at *1, *8 (D. Md. Oct. 18, 2024) (reducing a life sentence to forty years where the defendant, twenty-five years old at sentencing, and fifty-five at the time of the ruling, had aided and abetted the murder of a federal witness by identifying the victim); *United States v. Addison*, CCB-98-0210, 2024 WL 5202243, at *1 (D. Md. Dec. 23, 2024) (reducing multiple life sentences to thirty-five years for a defendant who had ordered murders in furtherance of a drug conspiracy); *United States v. Savoy*, JKB-05-00415, 2024 WL 3091125, at *1 (D. Md. June 21, 2024) (reducing a life sentence to thirty years for the defendant's non-fatal shooting of a police officer during a nightclub brawl).

But, as shown, it is also true that some defendants who commit heinous crimes continue to receive lengthy sentences, including life imprisonment. Some judges have also declined to modify life sentences imposed years ago in such cases.

Regardless, under the rationale of *Rutherford*, the fact that some federal courts have been lenient with respect to sentencing in murder cases does not, standing alone, constitute an extraordinary and compelling reason for compassionate release with respect to a defendant who

has already received a life sentence. The offenses for which Holness is serving a life sentence—the brutal, calculated murder of his young wife, and the subsequent attempted intimidation of a witness—are profoundly serious. Defendant has not provided a ground for compassionate release merely because, in today's climate, some defendants who commit murder do not receive life sentences.

### 3. Sentencing Factors

I will assume, *arguendo*, that Mr. Holness's life sentence qualifies as an extraordinary and compelling reason for compassionate release, pursuant to U.S.S.G. § 1B1.13(a)(1)(A) (stating that "the court may reduce a term of imprisonment . . . if, after considering the factors set forth in 18 U.S.C. § 3553(a) . . . the court determines that extraordinary and compelling reasons warrant the reduction"). Even if Holness has established an extraordinary and compelling reason for compassionate release, that finding does not end the inquiry. As set forth in U.S.S.G. § 1B1.13(a)(1)(A), the Court must then consider the sentencing factors in 18 U.S.C. § 3553(a), to the extent applicable.

These factors include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentencing disparities; and (6) the need to provide restitution to victims. Again, these factors are pertinent only if the defendant first establishes a ground for compassionate release.

As for the nature of the offense and the defendant's characteristics, the Court has already recounted that Holness engineered a cold-blooded plot to murder Dunkley in order to obtain $500,000 from the life insurance policy he fraudulently took out in her name. ECF 169, ¶ 23.

Thus, his conduct was premeditated, not impulsive. It was also callous and brutal; Dunkley, who was just 27 years of age, was ruthlessly stabbed countless times. *Holness,* 706 F.3d at 582–83. And, after Holness was arrested and charged with Dunkley's murder, he sought to intimidate a fellow inmate to prevent him from cooperating with law enforcement. *Id.* ¶ 27.

The Court is mindful that Mr. Holness had no criminal history prior to the murder. ECF 169, ¶¶ 53–58. Nevertheless, despite powerful evidence of defendant's guilt, Holness persists in claiming that the prosecution was a sham and that his convictions are invalid.

Holness is certainly entitled to proclaim his innocence. And, given defendant's life sentence, it is understandable that defendant endeavors to challenge his conviction and his sentence on every available ground. Nevertheless,, he does not identify facts that support a claim of innocence. Instead, he has inundated the Court with countless motions, attacking the prosecution, the judicial process, and the validity of his convictions, on grounds that have already been considered, or on grounds that he has manufactured, or on grounds that are frivolous.

Defendant claims that his "post sentencing conduct is proof that he has been rehabilitated" and "committed to change." ECF 192 at 12. He points out that the BOP has "determined that he is" at a "low" "risk for recidivism" and he also has "a similar rating for his security." *Id.* According to Holness, he "has made . . . great headway and would continue to strive down the path of positive change." *Id.* at 13. Rehabilitation efforts alone do not justify compassionate release.

Holness submitted a Summary Reentry Plan prepared by the BOP on July 25, 2023, noting that he is at a "minimum risk recidivism level[.]" ECF 195 at 1 (the "Plan"). The Plan reflects the numerous education courses Holness completed between August 2011 and November 2022. *Id.*

at 2. In total, Holness has completed over thirty-five educational courses. *Id.*; *see* ECF 193-1 at 9; *see* ECF 232 at 3; ECF 232-1 (certificates of completion for numerous educational courses).

The government also submitted Holness's education records. ECF 188-2. These, too, reflect that Holness has completed many courses, such as physical education, legal research, and other courses. *Id.*

The Plan also reflects that "Holness has maintained clear disciplinary conduct during his incarceration." ECF 195 at 2. In addition, the Plan indicates that defendant "has maintained clear conduct and is well received by staff and inmates alike." *Id.* at 4. Furthermore, the Plan states: "Holness extends his knowledge of the law library and assists other inmates with their legal research." *Id.*

In addition, Holness submitted "Summary Reentry Plan – Progress Report," dated June 26, 2025, concerning his incarceration at Otisville FCI. ECF 222-3 ("Progress Report").[37] It details the impressive number of educational courses that Holness has completed during his incarceration. *Id.* at 2–3. Further, the Progress Report indicates that Holness had no incident reports in the preceding six months. *Id.* at 3.

Notably, the Progress Report reflects that Holness serves as a detail worker in the EB Housing Unit. *Id.* at 1. In this role, Holness "consistently performs his duties with professionalism and dedication[.]" *Id.* Indeed, the Progress Report states: "Holness demonstrates a strong commitment to supporting the well-being of fellow inmates in his living unit, creating a more positive and respectful environment." *Id.* It also states that Holness has shown his "dedication to inmate rehabilitation" by "teaching . . . key wellness classes designed to promote physical and mental health." *Id.* at 2.

[37] Multiple exhibits are docketed collectively at ECF 222-3.

In addition, twenty-three friends, fellow inmates, and family members have written to the Court in support of the Motion. Holness's daughter, Reanna Holness, has twice written to this Court, claiming that her father has "always made the point to be here for [his children] any way he possibly" could. ECF 221 at 1; *see also* ECF 185. Holness's cousin, Sanjae Wright, claims Holness "has matured and changed for the better." ECF 194 at 1. Another cousin describes defendant as "a thoughtful, kind, and deeply caring individual." ECF 229 at 1. Holness's aunt characterizes Holness as "a devoted father and a man who has always valued his family above all else in his life." ECF 225 at 1; *see also* ECF 224 at 1 (Holness's brother, stating that Holness "is a devoted father to" his two children and "a loyal sibling, and a true friend.").

Holness's pastor, Joseph Antoine, describes the defendant as a man "who, despite his circumstances, possesse[s] a genuine warmth and a desire to do right by the people he love[s]." ECF 234 at 1. Moreover, several fellow inmates wrote to the Court regarding the emotional support Holness has provided to them during incarceration. *See, e.g.,* ECF 211; ECF 212; ECF 215; ECF 217; ECF 218; ECF 220; ECF 223.

Holness's mother writes that defendant "is a change[d] man who regrets all his past actions[.]" ECF 179 at 1. Yet, defendant has not expressed remorse about Dunkley. To the contrary, despite compelling evidence of defendant's guilt, he continues to insist that his prosecution was unfounded and illegal.

The government argues that Holness's "completion of the courses does not equate to rehabilitation[.]" ECF 188 at 28. It points to the "heinous" nature of the defendant's crime as well as defendant's attempts to "cover-up the crime, including threatening a witness." ECF 188 at 28.

A defendant's behavior while in BOP custody is an important indicator of whether he remains a danger to the community. See 18 U.S.C. § 3582(c)(1)(A)(ii). Courts place significant

weight on a defendant's post-sentencing conduct because it "provides the most up-to-date picture of [his] 'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The court must "at least weigh the [defendant's] conduct in the years since the[] initial sentencing[]." *McDonald*, 986 F.3d at 412; *see Martin*, 916 F.3d at 397 (requiring an "individualized explanation" as to rehabilitative efforts).

Where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n.3; *see also United States v. Lancaster*, 997 F.3d 171, 175 (4th Cir. 2021) ("And in considering the § 3553(a) factors, the court can take into account a defendant's conduct after his initial sentencing."); *McDonald*, 986 F.3d at 410–12 (noting that on a motion to reduce sentence under the First Step Act, the court must consider defendant's post-sentencing conduct); *United States v. Randall*, 837 Fed. App'x 1008, 1009 (4th Cir. 2021) ("[A] district court must provide an individualized explanation for denying a sentence reduction motion under the First Step Act when the defendant presents evidence of his post-sentencing rehabilitation."); *United States v. Rudisill*, 834 Fed. App'x 827, 829 (4th Cir. 2021) (finding district judge abused his discretion in denying motion under the First Step Act without addressing defendant's post-sentencing conduct). Nevertheless, "rehabilitation alone cannot constitute an extraordinary and compelling reason for release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see Crawley*, 140 F.4th at 168.

Weighing the § 3553(a) factors, I am not persuaded that a life sentence for Mr. Holness exceeds what is "sufficient, but not greater than necessary" to serve the purposes of sentencing. With an offense level of 43 and a criminal history category of I, the Guidelines now call for a sentence of life imprisonment, just as they did when Holness was sentenced in 2011. *See* ECF

169, ¶ 61. To be sure, there are murder cases where some defendants do not receive sentences of life imprisonment, despite the Guidelines. *See Savoy*, 2024 WL 3091125, at *3 ("[I]t is exceedingly rare for federal defendants to be sentenced to life in prison today."); *Key Findings* at 2, in *Life Sentences in the Federal System*, U.S. SENT'G COMM'N (July 2022), https://perma.cc/7UC2-MJLH ("During fiscal years 2016 through 2021, there were 709 federal offenders sentenced to life imprisonment, which accounted for 0.2 percent of the total federal offender population."); *id.* at 5 ("Life sentences have remained a very small proportion of the federal offender population over the last 20 years (between 0.1% and 0.5%)."). But, those cases may involve defendants who received leniency based on acceptance of responsibility or other mitigating factors.

In any event, the review above makes clear that a life sentence for murder is not uncommon. And, even if life sentences are now less frequent, that circumstance does not constitute an extraordinary and compelling ground for compassionate release.

**B. Motion to Reconsider**

In the Motion to Reconsider (ECF 167), Holness asks the Court to reconsider Judge Nickerson's characterization of a § 2255 motion that he filed in 2014 (*i.e.*, ECF 132). Judge Nickerson denied that motion by Memorandum and Order of March 27, 2017. ECF 148; ECF 149. The Fourth Circuit affirmed. ECF 153. Thereafter, the Supreme Court denied Holness's petition for certiorari. *See* Docket.

Of import, "[u]nder a longstanding practice, a court sometimes treats as a request for habeas relief under 28 U.S.C. § 2255 a motion that a *pro se* federal prisoner has labeled differently." *Castro v. United States*, 540 U.S. 375, 377 (2003). If ECF 132 constituted a § 2255 petition, as Judge Nickerson determined, then, under 28 U.S.C. § 2255(h), the defendant must

obtain authorization from the appropriate appellate court in order to file a second or successive petition under § 2255. *See*, *e.g.*, *United States v. Poole*, 531 F.3d 263, 266 n.4 (4th Cir. 2008).

Section 2255(h) of 28 U.S.C. governs the filing of a second or successive post-conviction petition. It provides:

> A second or successive motion must be certified as provided in section 2244 by a panel of the appropriate court of appeals to contain—
>
> (1) newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found the movant guilty of the offense; or
>
> (2) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable.

If Holness has filed a motion that amounts to a post-conviction petition under § 2255, he has not obtained the requisite authorization. But, he asks the Court to reconsider Judge Nickerson's characterization of his previous § 2255 motion as a post-conviction petition. ECF 167 at 2. He asserts that the characterization of ECF 132 as a § 2255 petition was in "clear error violation of [the] law[.]" ECF 167 at 1. If defendant is correct, then ECF 132 would not amount to a § 2255 petition.

Holness relies on *Castro*, 540 U.S. 375, to argue that the Court should reconsider its characterization of his motion at ECF 132. *See* ECF 167 at 1. He contends that he was "never advised of Castro notice to recharacterize a pro-se litigant's motions as first motion for post-conviction relief and 2255." *Id.* at 2. Therefore, Holness reasons that he "could have further raise [sic] constitutional claim before his one year toll." *Id.* (citing cases). Holness also states: "Counsel's ignorance of a point of law that is fundamental to Holness [sic] case combined with his/her failure to perform basic research on that point is a quintessential example of unreasonable performance." *Id.* (citing cases).

In *Castro*, 540 U.S. at 794, the Supreme Court determined that a court may recharacterize a pro se motion "to create a better correspondence between the substance" of the motion and "its underlying legal basis[.]" The Court explained: "Federal courts sometimes will ignore the legal label that a pro se litigant attaches to a motion and recharacterize the motion in order to place it within a different legal category." *Id.* at 381. The Supreme Court also said, *id.* at 383, that, before recharacterizing a pro se litigant's motion

> as a first § 2255 motion . . . , the district court must notify the pro se litigant that it intends to recharacterize the pleading, warn the litigant that this recharacterization means that any subsequent § 2255 motion will be subject to the restrictions on "second or successive" motions, and provide the litigant an opportunity to withdraw the motion or to amend it so that it contains all the § 2255 claims he believes he has.

*Castro* does not apply here. This is not a situation in which Judge Nickerson construed an ambiguous filing of a pro se litigant and labeled it as defendant's "first § 2255 motion." *Id*. at 383. Rather, Holness filed a petition that he expressly brought under 28 U.S.C. § 2255. *See* ECF 132. Indeed, Holness titled his supporting memorandum of law as "Memorandum of Law in Support of 18 U.S.C. § 2255[.]" ECF 132-1. Accordingly, Judge Nickerson was entitled to construe the motion for what it was — a post-conviction petition. There is no basis for this Court to reconsider his characterization of defendant's previous § 2255 motion (ECF 132).

Moreover, under the circumstances, Judge Nickerson was not required to notify Holness in advance of his determination to construe defendant's prior submission under 28 U.S.C. § 2255. *See United States v. Joseph*, 455 Fed. Appx. 341, at *1 (4th Cir. 2011) (per curiam) ("Because [petitioner's] motion to reopen was not construed as his first § 2255 motion, *Castro's* holding is inapplicable. Joseph's prior § 2255 motion already restricted any second or successive motions . . . ."); *see also Saeku v. United States*, TWB-07-304, 2014 WL 11996375, at *1 (E.D.N.C. Jan. 27, 2014), *dismissed*, 580 Fed. App'x 195 (4th Cir. 2014), *cert. denied*, 135 S. Ct.

1516, (2015), *reh'g denied*, 135 S. Ct. 1891 (2015); *United States v. Sullivan*, HMH-01-898, 2013 WL 12098813, at *1 (D.S.C. Sept. 27, 2013), *dismissed*, 563 Fed. App'x 245 (4th Cir. 2014).

In short, ECF 167 lacks merit. In light of defendant's prior filing under § 2255 (ECF 132), the procedural restrictions on subsequent § 2255 motions apply. *See* 28 U.S.C. § 2255(h).

**C. Motions to Vacate**

**1. 28 U.S.C. § 2255**

Section 2255(a) of Title 28 of the United States Code provides relief to a prisoner in federal custody only on specific grounds: "(1) 'that the sentence was imposed in violation of the Constitution or laws of the United States,' (2) 'that the court was without jurisdiction to impose such [a] sentence,' (3) 'that the sentence was in excess of the maximum authorized by law,' and (4) that the sentence 'is otherwise subject to collateral attack.'" *See Hill v. United States*, 368 U.S. 424, 426–27 (1962) (citing 28 U.S.C. § 2255); *see also United States v. Hodge*, 902 F.3d 420, 426 (4th Cir. 2018); *United States v. Newbold*, 791 F.3d 455, 459 (4th Cir. 2015); *United States v. Pettiford*, 612 F.3d 270, 277 (4th Cir. 2010).

As noted, 28 U.S.C. § 2255(h) governs the filing of a successive post-conviction petition. Of import, a district court lacks jurisdiction over a second or successive post-conviction petition filed without authorization by the appropriate court of appeals. *See id.*; *see also Byers*, 2026 WL 867905, at *1 ("[B]ecause [defendant] did not first obtain authorization from our Court to file a second or successive § 2255 motion, the district court necessarily lacked jurisdiction to consider" his motion). A court that lacks jurisdiction over a second or successive petition must dismiss the

petition. *United States v. Brown*, PJM-06-0140, 2017 WL 4310126, at *2 (D. Md. Sept. 27, 2017).[38]

In this case, defendant has not obtained authorization to file a successive § 2255. Nevertheless, he does not label his motions as post-conviction petitions. That said, his goal is to vacate his convictions. In my view, despite the way in which defendant has titled certain motions, they constitute, in substance, motions to vacate.

**2. Rule 12 Motion**

In defendant's Rule 12 Motion (ECF 199), he claims that his indictment and judgment are unlawful because they lacked "a valid federal nexus[.]" *Id.* at 3. He asserts that the judgment against him "is fundamentally flawed and is in jurisdictional defect." *Id.* Holness reasons that the judgment against him "is void because the court lacks personal jurisdiction[.]" Defendant also argues that the Court lacked subject matter jurisdiction, because his marriage to Dunkley was a "sham." *Id.* at 4.

Therefore, Holness seeks to dismiss the judgment entered against him, pursuant to Fed. R. Civ. P. 12(h)(3). But, the rules of civil procedure are inapplicable to Holness's criminal case.

To support his assertions, Holness also cites 18 U.S.C. § 2261(a)(1), a statute under which he was convicted. *See* ECF 103 at 1. Section 2261(a)(1) prohibits a person from travelling or being present "within the territorial jurisdiction of the United States with the intent to kill, injure, harass, or intimidate *a spouse, intimate partner,* or dating partner, and who, in the course of or as

[38] However, "when a prisoner's successful habeas petition results in a new, intervening judgment, the prisoner's first habeas petition to challenge that new judgment is not second or successive within the meaning of § 2244(b), regardless of whether the petition challenges the prisoner's sentence or underlying conviction." *In re Gray*, 850 F.3d 139, 144 (4th Cir. 2017).

a result of such travel or presence, commits or attempts to commit a crime of violence against that *spouse, intimate partner,* or dating partner[.]" *Id.* (emphasis added).

Holness argues that the statute is inapplicable because his marriage to Dunkley was "fraudulent" and "void from its inception." ECF 199 at 4. In addition, defendant describes his marriage as a "sham," because it was made "for the purpose of obtaining a greencard [sic] for the victim[.]" *Id.* Holness adds that he and Dunkley "were close relatives and . . . were never in any sort of romantic relationship at anytime." *Id.* According to defendant, "18 U.S.C. § 2261 expressly requires that there be a valid marriage, or some sort of romantic relationship between the defendant and the victim." *Id.* Without that romantic link, argues Holness, "the proscribed conduct does not violate 18 U.S.C. § 2261 and therefore there is no jurisdiction." *Id.*

A challenge to the federal court's jurisdiction with respect to a criminal matter implicates Fed. R. Crim. P. 12(b). Holness uses Rule 12(b) as a vehicle to vacate his judgment. But, in my view, ECF 199 is actually a successive § 2255 motion. And, as discussed, because Holness has not received authorization from the Fourth Circuit to bring such a motion, this Court is without jurisdiction to consider ECF 199. *See* 28 U.S.C. § 2255(h).

Even assuming that Rule 12(b) is applicable, Holness's invocation of Rule 12 would not provide relief. Fed. R. Crim. P. 12(b)(1) states, in part: "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Under Rule 12, the Court should dismiss criminal charges in an indictment "where there is an infirmity of law in the prosecution", such as an unconstitutional statute. *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012). A court also "lacks jurisdiction over an indictment that 'fail[s] to charge conduct that amounts to an offense against the laws of the United States.'" *United States v.*

*Chesapeake Reg'l Med. Ctr.*, 814 F. Supp. 3d 608, 617 (E.D. Va. 2025) (quoting *United States v. Scott*, 61 F.4th 855, 859 (11th Cir. 2023)).

Under Fed. R. Crim. P. 12(b)(2), a "motion that the court lacks jurisdiction may be made at any time while the case is pending." But, when a defendant's criminal case is no longer pending, a motion under Rule 12(b)(2) is untimely. *See United States v. Brown,* MFU-16-30026, 2024 WL 1624737, at *1 (W.D. Va. Apr. 15, 2024)*, appeal dismissed,* 2024 WL 4602686 (4th Cir. Aug. 1, 2024).

The government claims that a motion for relief under Fed. R. Crim. P. 12(b) is untimely. ECF 209 at 5. I agree. The jury convicted Holness on March 28, 2011. ECF 93. Holness appealed, ECF 105, and the Fourth Circuit affirmed defendant's convictions in 2013. ECF 121; *Holness*, 706 F.3d 579. After the mandate issued, (ECF 127), Holness petitioned the Supreme Court for certiorari, which was denied on October 7, 2013. *Holness*, 571 U.S. 867. Because Holness has "been convicted and his conviction has been affirmed on appeal, his case is no longer pending." *United States v. Matthews*, 473 F. App'x 316, 316 (4th Cir. 2012) (per curiam).

In my view, Holness's motion for relief under Rule 12(b)(2) is tantamount to an improper, successive § 2255 petition. In any event, it is an untimely Rule 12 motion. I shall dismiss and deny it.

**3. Rule 60 Motion**

In the Rule 60 Motion (ECF 200, ECF 213), defendant challenges his convictions under various provisions of Fed. R. Civ. P. 60, which is titled "Relief from a Judgment or Order." He moves to vacate his conviction pursuant to Fed. R. Civ. P. 60(b)(2), (b)(3), (b)(4), and (d)(3), asserting that his conviction was procured by fraudulent representations of the government.

Fed. R. Civ. P. 60(b) is captioned "Grounds For Relief From A Final Judgment, Order, or Proceeding." Pursuant to Fed. R. Civ. P. 60(b)(2), Holness asks the Court "for an order to set aside [his] judgment, and conviction . . . [b]ecause of newly discovered evidence that shows the government witness and chief investigator lied under oath, while the United State attorneys suborned it." ECF 200 at 2. And, he urges the Court to vacate his conviction pursuant to Rule 60(b)(3), claiming the government committed fraud against the Court, *id.* at 15, and government attorneys engaged in perjury "during [a] motion hearing to suppress evidence, gathered in violation of Holness's Fifth and Sixth Amendment rights." *Id.* at 4. Further, Holness avers that his prosecution was the product of "a cooperative effort by the government prosecutors and officers of the Maryland State Police to intentionally injure Holness and to deceive the court seriously affecting the integrity of the normal process of adjudication[.]" *Id.* at 15–16.

Moreover, Holness relies on Rule 60(b)(4) in asking the Court to set aside the judgment "entered upon him[.]" *Id.* at 9. Reiterating the claims set forth in ECF 199, Holness asserts that the Court "lacked subject matter personal jurisdiction to convict him" because "the required federal nexus of a valid marriage between Holness and the victim was missing." *Id.* at 10.

In a civil case, Rule 60(b) permits a party to file a motion to "relieve [the] party . . . from a final judgment" for "any . . . reason that justifies relief." *See Liljeberg v. Heath Serv. Acquisition Corp.*, 486 U.S. 847, 863 (1988) (noting that Rule 60(b) "provides a procedure whereby, in appropriate cases, a party may be relieved of a final judgment.[]"). Of import, "Rule 60(b) applies to § 2255 proceedings, but only 'to the extent that [it is] not inconsistent with' applicable statutory provisions and rules." *United States v. McRae*, 793 F.3d 392, 397 (4th Cir. 2015) (quoting Rule 12 of the Rules Governing Section 2255 Proceedings) (alteration in *McRae*).

In particular, in a civil case, Rule 60(b) allows a party to obtain relief from a final judgment based on the following:

> (1) mistake, inadvertence, surprise, or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
>
> (6) any other reason that justifies relief.

In order "to obtain relief from a final judgment under Rule 60(b), one of the six grounds enumerated must be satisfied." *Daulatzai v. Maryland*, 97 F.4th 166, 178 (4th Cir. 2024). However, "[t]o prevail, a party must first demonstrate (1) timeliness,[] (2) a meritorious defense,[] (3) a lack of unfair prejudice to the opposing party,[] and (4) exceptional circumstances. Once a party has met this threshold, he must then show that he qualifies for relief under one of the six specific categories listed in Rule 60(b)." *Justus v. Clarke*, 78 F.4th 97, 105–06 (4th Cir. 2023) (cleaned up, citation and quotation marks omitted).

Rule 60(b)(6), sometimes referred to as the "catchall provision", *see, e.g., United States ex rel. Kyer v. Thomas Health Sys., Inc.*, 178 F.4th 119, 138 (4th Cir. 2026), should be applied only in "extraordinary circumstances." *Allen*, 165 F.4th at 288; *see Liljeberg*, 486 U.S. at 863–64; *Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 416 (4th Cir. 2025); *Aikens v. Ingram,* 652 F.3d 496, 500 (2011). "Unless the circumstances are truly extraordinary, however, they cannot outweigh the fundamental principle of finality of judgments." *Golden Corral Corp. v. Illinois Union Ins. Co.*, 182 F.4th 326, 328 (4th Cir. 2026). And, "Rule 60(b)(6) does not provide an opportunity for a 'do over' when a chosen litigation strategy turns out to have been the wrong

one." *Id.* at 332; *see Chavez-Deremer*, 147 F.4th at 416 ("Rule 60(b)(6) is not a vehicle for a do-over[.]")

Moreover, Rule 60(b) "does not authorize a motion merely for reconsideration of a legal issue." *United States v. Williams,* 674 F.2d 310, 312 (4th Cir. 1982); *see MSP Recovery Claims, Series LLC v. Lundbeck LLC*, 130 F.4th 91, 112 (4th Cir. 2025) ("Rule 60(b) does not authorize 'reconsideration of legal issues already addressed in an earlier ruling.'") (citation omitted), *cert. denied*, 146 S. Ct. 821 (2025). Put another way, "[w]here the motion is nothing more than a request that the district court change its mind . . . it is not authorized by Rule 60(b)." *Williams,* 674 F.2d at 313.

In addition, "'[i]t is a well settled principle of law that a Rule 60(b) motion seeking relief from a final judgment is not a substitute for a timely and proper appeal.'" *Wells Fargo*, 859 F.3d at 300 (citing *Dowell*, 993 F.2d at 48) (alteration added); *see Allen v. Stein*, 165 F.4th 272, 286 (4th Cir. 2026) ("Rule 60(b) governs final judgments."). Rather, "a Rule 60(b) motion is appropriate to raise a significant change in the law or facts, or when 'the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension.'" *Classen Immunotherapies, Inc. v. King Pharmaceuticals, Inc.*, 981 F. Supp. 2d 415, 419 (2013) (internal citation omitted).

Of import, "[a] Rule 60(b) motion cannot be used to file what is, in effect, a successive, unauthorized § 2255 petition." *Hilliard v. United States*, ELH-17-0191, 2025 WL 3083679, at *5 (D. Md. Nov. 5, 2025). In particular, "a Rule 60(b) motion in a habeas proceeding that attacks 'the substance of the federal court's resolution of a claim on the merits' is not a true Rule 60(b) motion, but rather a successive habeas petition . . . . A Rule 60(b) motion that challenges 'some

defect in the integrity of the federal habeas proceedings,' however, is a true Rule 60(b) motion, and is not subject to the preauthorization requirement [for successive petitions]." *McRae,* 793 F.3d at 397 (internal citations omitted).

Holness's claims in ECF 200 and ECF 213 appear to constitute a challenge to the validity of his convictions. Based on the relief requested, Holness's Rule 60 Motion (ECF 200, ECF 213) may constitute a successive § 2255 motion. *See Banister v. Davis*, 590 U.S. 504, 509–11 (2020); *Byers*, 2026 WL 867905, at *1; *United States v. Smith*, 2024 WL 2151186, at *1 (4th Cir. May 14, 2024) (per curiam). If so, Holness has not obtained the requisite authorization from the Fourth Circuit.

In any event, the Rule 60 Motion is flawed. This is because Holness makes "no showing that the judgment entered in his previous § 2255 motion is defective for any of the reasons outlined in Rule 60(b)." *United States v. Ferguson*, JFA-06-61, 2012 WL 13018608, at *1 (D.S.C. Sept. 12, 2012). Further, "Rule 60(b) motions must be made 'within a reasonable time,' Fed. R. Civ. P. 60(c), and are granted only when the moving party demonstrates timeliness, a meritorious defense, a lack of unfair prejudice to the opposing party, and exceptional circumstances[.]" *Clear Touch Interactive, Inc. v. Ockers Co.*, 171 F.4th 715, 728 (4th Cir. 2026) (citing *Justus*, 78 F.4th at 105). ECF 200 and ECF 213 are untimely because defendant waited years after the denial of his first § 2255 motion to file his Rule 60(b) motion.

Therefore, I shall dismiss and deny ECF 200 and ECF 213.

### 4. Certificate of Appealability

In summary, I shall dismiss and deny Holness's Rule 12 Motion (ECF 199) and his Rule 60 Motion (ECF 200, ECF 213). In my view, these motions amount to an unauthorized, successive § 2255 petition, for which the Court lacks jurisdiction. *See United States v. Winestock*, 340 F.3d

200, 205 (4th Cir. 2003) ("In the absence of pre-filing authorization, the district court lacks jurisdiction to consider an application containing abusive or repetitive claims.").

Pursuant to Rule 11(a) of the Rules Governing Proceedings under 28 U.S.C. § 2255, the court is required to issue or deny a certificate of appealability ("COA") when it enters a final order adverse to the applicant with respect to a post-conviction claim. A COA is a "jurisdictional prerequisite" to an appeal from the court's earlier order. *United States v. Hadden*, 475 F.3d 652, 659 (4th Cir. 2007). In other words, unless a COA is issued, a petitioner may not appeal the court's decision in a § 2255 proceeding. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b).

A COA may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see Buck v. Davis*, 580 U.S. 100, 115 (2017). Where the court denies a petitioner's motion on its merits, a petitioner satisfies this standard by demonstrating "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (citation and internal quotation marks omitted), or that "the issues presented are adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003); *see also Slack v. McDonald*, 529 U.S. 473, 484 (2000).

Holness has not made a substantial showing of the denial of his constitutional rights. Therefore, I decline to issue a COA.[39]

### C. Discovery Motions

#### 1. Requests for Court Filings

Holness seeks copies of court filings in his criminal case and in the case of his accomplice.

[39] Although this Court denies a COA, this ruling does not preclude Holness from seeking a COA from the appropriate appellate court, *i.e.*, the United States Court of Appeals for the Fourth Circuit.

As indicated, the Court has already provided some documents to defendant, via the wardens where he was incarcerated at relevant times. *See* ECF 157; ECF 157-1; ECF 178; ECF 178-1; ECF 184; ECF 184-1. The Administrative Assistant for the Staff Attorney's Office of this Court has informed Mr. Holness that, if he seeks to obtain additional filings that are public, he must send a request noting the particular ECF numbers from the Docket, which was also provided to him. ECF 157, ECF 178. Holness was also told that, upon receipt of a request, the Court will advise him of the cost of the copy work. But, if Holness cannot afford the fee, he can submit a motion asking the government to pay the expenses. *See id.*

Defendant requested (ECF 182) several court filings for which access is restricted to the Court and its staff. Specifically, he seeks copies of ECF 2; ECF 20; ECF 43; ECF 56 and ECF 72. "[A] district court 'has supervisory power over its own records and may, in its discretion, seal documents if the public's right of access is outweighed by competing interests.'" *Ashcraft v. Conoco, Inc.*, 218 F.3d 288, 302 (4th Cir. 2000) (quoting *In re Knight Pub. Co.*, 743 F.2d 231, 235 (4th Cir. 1984)). Rule 49.1(d) of the Federal Rules of Criminal Procedure states, in part: "The court may order that a filing be made under seal without redaction." Further, Rule 49.1(d) states: "The court may later unseal the filing or order the person who made the filing to file a redacted version for the public record."

Notably, ECF 2, ECF 20, and ECF 43 merely contain the signatures of the forepersons of the grand juries that issued the federal indictments of Mr. Holness. "[T]he responsibilities of a federal grand jury foreman are essentially clerical in nature: administering oaths, maintaining records, and signing indictments. The secrecy imperative in grand jury proceedings demands that someone 'mind the store,' just as a secretary or clerk would keep records of other sorts of proceedings. But the ministerial trappings of the post carry with them no special powers or duties

that meaningfully affect the rights of persons that the grand jury charges with a crime, beyond those possessed by every member of that body." *Hobby v. United States*, 468 U.S. 339, 344–45 (1984). Of import, "signatures on the indictment are not required to be displayed on the public docket." *Chiles v. United States*, IMK-18-7, 2021 WL 6010347, at *4 (N.D.W. Va. Dec. 20, 2021).

The indictments are otherwise publicly available. Holness has presented no basis that entitles him to access to the identities of the forepersons. Accordingly, his request for access to those documents is denied.

ECF 56 and ECF 72 are Clerk minutes from Holness's criminal proceeding from his arraignment on March 4, 2011 (ECF 56) and the second day of his jury trial on March 15, 2011. ECF 72. These are internal Court entries, for which access is restricted to Court personnel. Defendant has presented no basis to access these minutes. *See* ECF 184. Accordingly, Holness's request to access these documents is denied.

Of the other specific documents referenced on the Docket that Holness has requested, only one filing is under seal: ECF 65.

ECF 65 is an Order of March 10, 2011, signed by Judge Nickerson, issued to the Warden of the Baltimore County Detention Center, commanding the appearance of the named individual as a witness at trial on March 21, 2011. Notably, it pertains to a defense request for the issuance of a subpoena at government expense. *See* ECF 60, ECF 60-3. Judge Nickerson granted the request by Order dated and docketed on March 10, 2011. *See* ECF 64.[40] However, t does not appear that the witness actually testified. *See* ECF 109 to ECF 119.

---

[40] The address on the Order reflects that the individual was held at the Metropolitan Transition Center, not the Baltimore County Detention Center. *See* ECF 65.

The name of the witness should be known by defense counsel. And, they may have a copy of the subpoena requests filed by the defense. In any event, I shall ask the government to advise the Court as to whether it objects to the disclosure of ECF 65 and, if so, the grounds, due by **October 30, 2026**.

Accordingly, Holness's request for court documents that are not publicly available, *see* ECF 182, is denied, with the exception of his request for the document associated with ECF 65. As to ECF 65, I shall defer my decision pending the government's response.[41]

**2. Defendant's Case File and Discovery**

I have already recited facts concerning defendant's request to obtain his case file from his former lawyers, as well as the discovery produced by the government to his lawyers. Former defense counsel assert that under the Discovery Agreement with the government, "release of discovery materials [to defendant] was conditioned on prior approval by government counsel." ECF 228 at 4. Holness's former counsel claim that, "but for the Discovery Agreement, defense counsel have no objection to producing the discovery that was provided by the government, if so directed by the Court." *Id*. Former defense counsel also maintain that "the Court does not have the authority to compel attorney(s) to give the case file to Mr. Holness." *Id.* (citing *United States v. Perez-Chach,* DLB-13-496, ECF 764).

Since the filing of ECF 228 by former defense counsel, the Fourth Circuit has had occasion to review *Perez-Chach*. *See United States v. Perez-Chach*, 2026 WL 2211215 (4th Cir. July 31, 2026) (per curiam). There, the district judge told the defendant, DLB-13-496, ECF 764: "The Court does not have the authority to compel your attorney to give the case file to you. Your request

[41] Mr. Holness may, of course, respond to the government's filing, provided he does so within twenty-one days of receipt of the response.

is denied." *Id.* But, on July 31, 2026, in a per curiam opinion, the Fourth Circuit vacated that order and remanded the matter to the district court. The Fourth Circuit said, 2026 WL 2211215, at *1: "Under the Maryland Rules of Professional Conduct 19-301.16(d) (2025), '[u]pon termination of representation, an attorney shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property *to which the client is entitled*.'" (Emphasis added). The Fourth Circuit ruled: "Perez-Chach's former trial counsel should return the case file to Perez-Chach to the extent required by Rule 19-301.16(d)[.]" *Id.*

As noted, Rule 19-301.16(d) of the Maryland Rules of Professional Conduct requires an attorney, "[u]pon termination of representation," to "surrender[ ] papers and property to which the client is entitled." *See United States v. Basham*, 789 F.3d 358, 388 (4th Cir. 2015) (reviewing legal authority requiring counsel to deliver client's file upon termination of representation). Accordingly, former defense counsels' contention that this Court lacks authority to compel them to provide Mr. Holness with his case file (ECF 228 at 4) sweeps too broadly. But, I agree with defense counsel that discovery materials obtained from the government are a separate matter. To the extent that the discovery is subject to an agreement with the government barring its release to the physical custody of the defendant, the agreement governs.

In *United States v. Powell*, 2021 WL 6116624, at *1 (4th Cir. Dec. 27, 2021) (per curiam), the Court found that the district court abused its discretion in denying defendant's motion to compel defense counsel to produce the discovery in his closed criminal case file "without considering the terms of the nondisclosure agreement [with the government] and the impact, if any, on counsel's obligation under Rule 19-301.16(d)." The Court noted that the alleged nondisclosure agreement was not part of the record and defendant's assertion "that he was

unaware" that his counsel entered "a nondisclosure agreement" with the government. Therefore, it remanded the matter to the district court.

But, this case is unlike *Powell*. Here, the Discovery Agreement in issue is part of the record. And, this Court has considered it. The Discovery Agreement clearly bars defendant from possession of the discovery material.

Nevertheless, defense counsel went the extra mile, and asked government counsel for permission to provide defendant with the discovery. The government declined to do so. And, Holness's former counsel provided the Court with email correspondence dated August 7, 2025, reflecting that counsel asked the government for permission to provide the material to the defendant. ECF 228-3. However, Assistant United States Attorney Michael C. Hanlon declined to "authorize . . . Mr. Holness to receive a copy of his discovery . . . ." ECF 228-4.

The government's decision regarding discovery does not preclude defendant's review of the discovery material, if arrangements can be made for him to do so. But, defendant has no right to possession of the discovery material.

In addition, former defense counsel argue that Standing Order 2020-01 prohibits Holness from accessing the discovery materials without government consent or a court order. ECF 228 at 4. Indeed, notwithstanding *Perez-Chach*, the Fourth Circuit has said: "There is no binding authority stating that a court must, upon request, order an attorney to provide an incarcerated client with the client's case file, and the District of Maryland's standing orders specifically prohibit access to many of the documents [in a criminal case file]." *United States v. Williams*, 2024 WL 937072, at *1 (4th Cir. Mar. 5, 2024) (per curiam).

The danger associated with allowing a defendant to maintain criminal discovery materials in his prison cell is well documented. Indeed, in *United States v. Hall*, 506 F. App'x 245 (4th Cir.

2013), the Fourth Circuit recounted the fatal consequences that stemmed from the violation of a discovery agreement that barred the client from retaining physical copies of discovery. *Id.* at 247. Specifically, a defense attorney violated the agreement and provided his client with an investigative report of an interview. *Id.* The interview was publicly circulated, and it culminated in the murder of the interviewee. *Id.*

In the aftermath of this tragedy, the District Court for the District of Maryland commenced the issuance of standing orders designed to prevent a defendant's possession of sensitive information that could lead to violence and murder. *See* Standing Order 2012-10; Standing Order 2015-04. Due to ongoing safety concerns, the Court issued another Standing Order in 2019. It provided that Rule 11 and sentencing transcripts would only be sent to defense counsel of record or to the warden of a defendant's prison. *See* Standing Order 2019-06. Transcripts may not be provided directly to an inmate.

And, on February 5, 2020, the Court issued Standing Order 2020-01. As discussed, it provides that physical copies of discovery material may not be sent directly to an incarcerated defendant, absent consent from the government or an Order of the Court. This Court's Standing Order 2020-01 prohibits Holness from having possession of discovery materials, absent government consent or Court Order.

Defendant attacks the District of Maryland's Standing Orders as unconstitutional deprivations of a criminal defendant's right to due process. ECF 231 at 2. This Court's policy of restricting possession of discovery in a criminal case stems from the documented tragedy of witness intimidation and murder that can flow from the documents falling into the wrong hands, as discussed earlier. *Smith,* 2013 WL 5945662, at *4 n.5 ("The distribution of discovery by

defendants to their associates has resulted in the deaths of witnesses in this district."). The policy is both sound and lawful.

Holness contends that, even if the standing orders "are well meaning, they do not apply to [him]" because "[m]ost of the witnesses that testified are public officials that work for the State of Maryland. The others are considered to be eye witnesses." ECF 231 at 2. But, a jury convicted Holness of knowingly attempting to intimidate a witness to influence an official proceeding. ECF 93. Witness intimidation is an underlying rationale for discovery agreements like the one in place between the defendant and the government. *Smith,* 2013 WL 5945662, at *4. Holness is incorrect in asserting that the Court's standing orders do not apply to him.

Further, Holness complains that former defense counsel entered into the Discovery Agreement "without his knowledge or consent[.]" ECF 231 at 2. Former defense counsel do not indicate whether they consulted with defendant before signing the Discovery Agreement. *See* ECF 228. But, they contend that Holness "did not receive ineffective assistance of counsel as a result of defense counsel entering into a Discovery Agreement with the government." ECF 228 at 5 (citing *United States v. Gaver,* 815 F. App'x 700, 702 (4th Cir. 2020) (determining that defense "counsel's alleged failure to negotiate a 'fair' discovery agreement that allowed [defendant] to keep copies of the Government's evidence" did "not conclusively establish that counsel provided ineffective assistance.").

Even if former counsel for Holness did not obtain defendant's consent to enter the Discovery Agreement, that would not invalidate the Discovery Agreement. As the Fourth Circuit has explained, "[t]here are essentially two categories of decisions made by a criminal defendant's trial counsel: those decisions, deemed 'personal,' that must be made with the defendant's consent and those that may be made without the defendant's consent." *Sexton v. French*, 163 F.3d 874,

884 (4th Cir. 1998). "The decisions that must be made with the defendant's consent include the decision to enter a guilty plea, the decision to waive a jury trial, the decision to pursue an appeal, and . . . the decision to testify at trial." *Id.* (citations omitted). But, some decisions "may be made without the defendant's consent." *Id.* These decisions "'primarily involve trial strategy and tactics,' such as 'what evidence should be introduced, what stipulations should be made, what objections should be raised, and what pre-trial motions should be filed.'" *Id*. (quoting *United States v. Teague*, 953 F.2d 1525, 1531 (11th Cir. 1992)).

Notably, "[e]ntering into a discovery agreement with the Government is a common practice in this district and does not create a conflict of interest. The discovery agreement prohibits counsel from providing a defendant with copies of discovery materials for reasons of witness safety;[] however, it allows counsel to review any discovery materials with the defendant." *Smith v. United States*, WDQ-12-3113, 2013 WL 5945662, at *4 (D. Md. Nov. 5, 2013).

Indeed, "acceptance" of agreements, such as the Discovery Agreement at issue here, are "considered a 'customary practice among the defense bar in [Maryland].'" *Hightower v. United States*, GJH-15-0322, 2022 WL 4134314, at *5 (D. Md. Sept. 12, 2022) (quoting *United States v. Smith*, 640 F.3d 580, 583 (4th Cir. 2011)); *see Coats v. United States,* RDB-09-333, 2018 WL 1570241, at *8 (D. Md. Mar. 30, 2018) (describing an agreement similar in substance to the Discovery Agreement as "boilerplate"). And, a lawyer who enters into a discovery agreement, such as the one at issue here, "exercises sound professional judgment" because a discovery agreement "secures important benefits for [a criminal defendant] and provides complete discovery." *See Smith*, 2013 WL 5945662, at *3.

To illustrate, "[g]enerally, criminal defendants do not have a constitutional right to discovery, absent a statute, rule of criminal procedure, or some other entitlement." *United States*

*v. Uzenski*, 434 F.3d 690, 709 (4th Cir. 2006); *see, e.g., United States v. Palacios*, 677 F.3d 234, 246 (4th Cir. 2012) ("Rule 16 imposes upon parties an ongoing duty to disclose 'additional evidence or material' discovered 'before or during trial . . . if . . . the other party previously requested, or the court ordered, its production.'") (quoting Fed. R. Crim. P. 16(c)). Here, the Discovery Agreement obligated the government to provide the defense with discovery materials, conditioned on the restriction that the material could not be disseminated to anyone outside of former counsel's office without the government's "prior approval[.]" ECF 228-2 at 2. Defense counsel entered an agreement with the government that limited defendant's possession of documents, in exchange for production. The defense got what it bargained for; the government produced the discovery. Defendant had every right to see it, but no right to retain it.

Entering into the Discovery Agreement (ECF 228-2) was a decision of "trial strategy," and counsel did not need to obtain Holness's consent before entering into the agreement on his behalf. *See Sexton*, 163 F.3d at 884. Indeed, a defense attorney is not ineffective because counsel "did not adequately explain" the terms of a discovery agreement before entering into it on the defendant's behalf. *See Baxam v. United States*, DKC-12-0121, 2021 WL 347842, at *3 (D. Md. Feb. 2, 2021); *see also Hightower*, 2022 WL 4134314, at *5 (rejecting defendant's contention that counsel was ineffective by signing a discovery agreement); *Gaver v. United States*, RDB-17-0640, 2021 WL 4502809, at *6 (D. Md. Oct. 1, 2021) (concluding that "the record does not show that counsel's performance was deficient in entering into the discovery agreement with the Government"), *aff'd in part, appeal dismissed in part,* 2023 WL 5275165 (4th Cir. Aug. 16, 2023) (per curiam); *Coats*, 2018 WL 1570241, at *8 (concluding that defendant's counsel's "did not fall below an objective standard of reasonableness" when counsel entered into a discovery agreement with the government); *Mormon v. United States*, PWG-12-CR-592, 2017 WL 2955740, at *5 (D. Md. July

11, 2017) (finding trial counsel did not render ineffective assistance by failing to provide him with discovery for his personal review because counsel had signed a discovery agreement with the government); *Kunjundzic v. United States*, PJM-10-639, 2017 WL 2335605, at *2–3 (D. Md. May 30, 2017) (rejecting defendant's argument "that his Sixth Amendment rights were violated when counsel and the Government co-signed a discovery agreement"); *Smith v. United States*, ELH-08-0086, 2016 WL 1321218, at *7 (D. Md. Apr. 4, 2016) (concluding that defendant "has provided no additional basis to show how the discovery agreement with the government presented a conflict of interest or demonstrates prejudice"); *Smith*, 2013 WL 5945662, at *3–4 (finding that defendant did not establish a conflict of interest that resulted in ineffective assistance of counsel when counsel entered into a discovery agreement with the government).

In addition, Holness disputes that his lawyers provided adequate access to the discovery material. ECF 231 at 2. But, "there simply is no requirement that an attorney show every page of voluminous discovery to his client, nor that the discovery be provided for the client's possession in jail." *United States v. Fisher*, SAG-20-0306, 2022 WL 4080290, at *5 (D. Md. Sept. 6, 2022), *aff'd,* 2024 WL 701791 (4th Cir. Feb. 21, 2024). Moreover, "[t]he fact that Standing Order 2020-01 provides a mechanism for a defense attorney to request to provide copies of particular documents . . . does not alone create some sort of requirement that counsel make a comprehensive request in order to provide constitutionally adequate representation." *Fisher*, 2022 WL 4080290 at *5.

That said, the criminal case file maintained by former defense counsel is not coextensive with the discovery exchanged between defense counsel and the government. A criminal case file may include other material, such as transcripts, notes, legal memoranda, documents obtained from sources other than the government, and attorney work product.

Former defense counsel do not address why Mr. Holness is not entitled to materials in the case file that are not covered by the Discovery Agreement, or that do not constitute attorney work product. *See* ECF 228. Indeed, the Fourth Circuit recently vacated and remanded a district court's denial of a criminal defendant's motion to compel former counsel to produce the defendant's case file. *See United States v. Hooper*, 2025 WL 3063859, at *1 (4th Cir. Nov. 3, 2025) (per curiam); *see also Perez-Chach*, 2026 WL 2211215; *United States v. Jenkins*, 816 F. App'x 852, 853 (4th Cir. 2020) (per curiam).

Therefore, I shall direct defendant's former lawyers to provide him with all materials in the case file(s) that do not fall within the parameters of the Discovery Agreement or otherwise constitute attorney work product.

**III. Conclusion**

For the foregoing reasons, I shall deny the Status Motion (ECF 172), as moot. I shall also deny the Motion (ECF 174; ECF 192; ECF 193; ECF 205; ECF 222; ECF 232), without prejudice to defendant's right to renew the motion on grounds consistent with the statute and U.S.S.G. § 1B1.13. In addition, I shall deny the Motion to Reconsider (ECF 167). And, I shall dismiss and deny the Rule 12 Motion (ECF 199) and the Rule 60 Motion (ECF 200; ECF 213). Further, I shall deny Holness's Discovery Motions in part and grant them in part (ECF 65, ECF 155, ECF 158, ECF 196, ECF 226). In particular, I shall require the disclosure of defense counsel's criminal case file, excluding materials subject to the Discovery Agreement, the attorney work product doctrine, and the document docketed at ECF 65. As to ECF 65, I shall require the government to provide its view as to the disclosure of ECF 65, due by **October 30, 2026.**

An Order follows.

Date: October 19, 2026

/s/

Ellen Lipton Hollander
United States District Judge